UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIE A. SU,<br>Acting Secretary of Labor,<br>United States Department of Labor,<br><br>*Plaintiff,*<br><br>v.<br><br>ADVANCED CARE STAFFING, LLC,<br>PRIORITY CARE STAFFING, LLC, and<br>SAMUEL KLEIN, an individual,<br><br>*Defendants.* | **AMENDED COMPLAINT**<br><br>Civil Action No. 23-cv-2119 |

**PRELIMINARY STATEMENT**

1.     The Fair Labor Standards Act requires employers to pay wages free and clear, not provisionally or subject to kickbacks. In flagrant disregard of the FLSA's requirements, Defendants Advanced Care Staffing, LLC ("ACS") and Priority Care Staffing, LLC ("PCS") (together, the "Staffing Companies") have required employees to sign contracts purportedly obligating them to complete at least three years of full-time work for the Staffing Companies in order to retain their earned wages. The contracts threaten employees that if they leave the Staffing Companies' employ before three years' time, they will face the Staffing Companies and their lawyers in an arbitration behind closed doors, where the Staffing Companies will demand that employees kick back much of their hard-earned wages—including wages to which they are entitled under federal law. Under this illegal scheme, the wages that the Staffing Companies promise their employees may be involuntarily converted into nothing more than a loan that employees must repay with interest and fees, leaving some employees with no compensation at all, much less the wages required by the FLSA. This illegal scheme violates the FLSA, which prohibits an employer

1

from holding employees' wages hostage, and from allowing employees to keep their wages free and clear only if employees remain in the service of their employer.

2.       The Staffing Companies, which have overlapping management and operations, have made good on their threats to demand wage kickbacks. When employees have resigned during their three-year term of service, even after complaining of unsafe conditions, the Staffing Companies have responded by hauling them into individual, private arbitrations. There, the Staffing Companies improperly demand that employees pay back tens of thousands of dollars of their wages, measured by the amount of future profits that the Staffing Companies projected it would earn off of employees' labor in future years (plus yet other costs the Staffing Companies incurred). The Staffing Companies' threats also deter employees from leaving their jobs, no matter the working conditions.

3.       The Staffing Companies have also threatened employees they would have to pay hundreds of dollars an hour for private arbitrators' time spent hearing the Staffing Companies' demands, for the Staffing Companies' own attorneys' fees, and for interest. Under this "loser pays" ultimatum, the Staffing Companies have pushed employees, and have threatened to push yet other employees, into arbitrations, where the Staffing Companies can run up the bill of that expensive private forum. Any employee who considers vindicating their statutory rights in an arbitration proceeding involving the Staffing Companies is also subject to the Staffing Companies' threat of fee-shifting.

4.       In the case of former ACS nurse Benzor Shem Vidal, ACS has demanded in arbitration amounts that may well require Mr. Vidal to surrender every penny of the wages ACS ever paid Mr. Vidal during his employment, plus more, all to satisfy ACS's claim of future profits. ACS's exorbitant arbitration demand would bring Mr. Vidal's wages below the FLSA's bare

minimum wage, including in his last workweek. The illegal demand would also violate the FLSA's overtime pay requirements for the period that Mr. Vidal worked more than 40 hours in a week.

5.      In other cases, ACS has, on information and belief, followed through with clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA.

6.      In the case of former PCS nurse Cherry Lyn Miclat, PCS has made a similarly exorbitant arbitration demand seeking to satisfy PCS's claim of future profits. PCS's demand would bring Ms. Miclat's wages below the FLSA's bare minimum wage in her last workweek and would also violate the FLSA's overtime pay requirements for the periods that Ms. Miclat worked more than 40 hours in a week.

7.      In other cases, PCS has, on information and belief, followed through with clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA.

8.      The FLSA does not permit an employer to comply with the minimum wage and overtime pay provisions in one month, only to attempt to claw back those protected wages to cover the employer's costs of business the next month. Nor does the FLSA permit an employer to treat workers as insurance for lost profits by unconditionally guaranteeing a future profit stream for the employer, plus arbitration costs and fees, when the result of the arbitration would be to bring employees below the FLSA's protected minimums.

9.      Defendants' demands, including the contracts imposed on their employees, have an impermissible chilling effect on their employees' ability to effectively vindicate their federal statutory rights, including the protection to be free from an unsafe or hazardous workplace, and to obtain unpaid wages due.

10.     Plaintiff Julie A. Su, Acting Secretary of Labor, U.S. Department of Labor (the "Secretary"), by and through undersigned counsel, brings this action pursuant to Section 16(c) and Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, *et seq*.) ("the Act" or "the FLSA"), because Defendants violated Sections 6, 7, and 15(a)(2) of the Act; to recover back wages and liquidated damages; to enjoin acts and practices that violate the provisions of the FLSA; and to obtain other appropriate relief.

11.     The Secretary brings this action to enjoin Defendants from their unlawful conduct demanding future profits and related attorneys' fees and costs in violation of the FLSA, to recover unpaid wages and liquidated damages due to the former employees from whom ACS has already initiated arbitrations, and to restrain Defendants from withholding unpaid wages from their former employees.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Section 17 of the FLSA, 29 U.S.C. § 217, and 28 U.S.C. §§ 1331 and 1345.

13.     Venue is proper in the Eastern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this District, specifically in Brooklyn. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### THE PARTIES

14.     Plaintiff Julie A. Su, Acting Secretary of Labor, United States Department of Labor, has the authority to file suit to restrain violations of the FLSA and recover back wages and liquidated damages.

**Defendants ACS and Klein**

15.     Defendant ACS is a limited liability company organized under the laws of New York.

16.     ACS's office is located at 1000 Gates Avenue, Suite 5B, in Brooklyn, New York.

17.     ACS has regulated the employment of all persons employed by it, and has acted directly and indirectly in its own interest in relation to its employees. ACS is an employer of its employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

18.     Defendant Samuel (Sam) Klein, an individual, is the Chief Executive Officer of ACS.

19.     On information and belief, Klein regularly performs duties as ACS's CEO from ACS's office in Brooklyn.

20.     On information and belief, Klein resides in Brooklyn.

21.     In his capacity as CEO, Klein oversees ACS's operations, including payroll, human resources, and recruitment of new employees.

22.     Klein has the authority to hire supervisory ACS personnel and has hired ACS employees.

23.     Klein has signed employment contracts with ACS employees on ACS's behalf.

24.     Klein has the authority to fire ACS employees.

25.     Klein has personally fired ACS employees.

26.     Klein supervises ACS's senior office employees.

27.     Klein oversees ACS's employee grievance process.

28.     On information and belief, Klein has the authority to determine employee compensation.

29.     Klein has acted directly and indirectly in the interests of ACS in relation to ACS employees and has regulated the terms and conditions of ACS employees' employment.

30.     Klein is an employer of ACS's employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d), and is a "person" within the meaning of Section 3(a) of the Act, 29 U.S.C. § 203(a).

31.     Together, ACS and Klein are employers of ACS's employees within the meaning of the FLSA.

**Defendants PCS and Klein**

32.     Defendant PCS is a limited liability company organized under the laws of New York.

33.     PCS's principal place of business is at 1274 49th Street, Suite 539, Brooklyn, New York.

34.     PCS has regulated the employment of all persons employed by it, and has acted directly and indirectly in its own interest in relation to its employees. PCS is an employer of its employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d).

35.     Defendant Samuel Klein, an individual, is the owner and Chief Executive Officer of PCS.

36.     On information and belief, Klein regularly performs duties as PCS's owner and CEO from ACS's office in Brooklyn, and from PCS's offices, including in Brooklyn.

37.     In his capacity as owner and CEO, Klein oversees PCS's operations, including payroll, human resources, and recruitment of new employees.

38.     Klein has the authority to hire PCS personnel, and on information and belief has hired PCS employees.

39.     Klein has signed employment contracts with PCS employees on PCS's behalf.

40.     On information and belief, Klein has the authority to fire PCS employees.

41.     Klein supervises PCS's senior office employees.

42.     On information and belief, Klein oversees PCS's employee grievance process.

43.     Klein has the authority to determine employee compensation.

44.     Klein has acted directly and indirectly in the interests of PCS in relation to PCS employees and has regulated the terms and conditions of PCS employees' employment.

45.     Klein is an employer of PCS's employees within the meaning of Section 3(d) of the Act, 29 U.S.C. § 203(d), and is a "person" within the meaning of Section 3(a) of the Act, 29 U.S.C. § 203(a).

46.     Together, PCS and Klein are employers of PCS's employees within the meaning of the FLSA.

**DEFENDANT ADVANCED CARE STAFFING IS AN ENTERPRISE ENGAGED IN COMMERCE**

47.     ACS is a staffing agency that recruits and places healthcare workers at positions in New York, New Jersey, and Connecticut, including at facilities owned or partly owned by one or more of ACS's part owners.

48.     ACS's business activities, as described herein, are related and performed through common control for a common business purpose and constitute an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

49.     ACS is an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

50.     Since at least 2019, ACS has had an annual gross volume of sales made or business done in an amount not less than $500,000.

51.     At any given time in recent years, ACS has employed hundreds of healthcare employees.

52.     ACS's healthcare employees work at nursing and healthcare facilities and provide patient care.

53.     ACS's healthcare employees handle goods and materials, such as medical supplies, that have been moved in or produced for commerce.

54.     ACS's office employees handle goods and materials, such as computers, that have been moved in or produced for commerce.

55.     ACS's employees, including Benzor Shem Vidal, have been employed in an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1)(A) of the Act, 29 U.S.C. § 203(s)(1)(A).

**DEFENDANT PRIORITY CARE STAFFING IS AN ENTERPRISE ENGAGED IN COMMERCE**

56.     PCS is a staffing agency that recruits and places healthcare workers at positions in states including New York, California, Florida, Washington, and Illinois, including at facilities owned or partly owned by one or more of ACS's part owners.

57.     PCS's business activities, as described herein, are related and performed through common control for a common business purpose and constitute an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

58.     PCS is an enterprise within the meaning of Section 3(r) of the Act, 29 U.S.C. § 203(r).

59.     Since at least 2019, PCS has had an annual gross volume of sales made or business done in an amount not less than $500,000.

60.     PCS's healthcare employees work at nursing and healthcare facilities and provide patient care.

61.     PCS's healthcare employees handle goods and materials, such as medical supplies, that have been moved in or produced for commerce.

62.     PCS's office employees handle goods and materials, such as computers, that have been moved in or produced for commerce.

63.     PCS's employees, including Cherry Lyn Miclat, have been employed in an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1)(A) of the Act, 29 U.S.C. § 203(s)(1)(A).

### THE SISTER STAFFING COMPANIES' RELATED OPERATIONS

64.     ACS and PCS hold themselves out to prospective employees and employees as related entities that share management, follow the same hiring practices, and use identical contracts.

65.     ACS and PCS share the same international department that works for both Companies, recruiting nurses in the Philippines and elsewhere to work for both Companies at the overlapping medical facilities in the United States.

66.     At times, ACS's Payroll Director, Finance Director, and HR Director provide payroll, finance, and human resources services for PCS.

67.     ACS's Vice of President of Operations and Recruitment Director have advised PCS on operations.

68.     PCS's Recruitment and Operations Director has consulted on matters for ACS.

69.     At times, PCS employees work out of ACS's Brooklyn office.

70.     ACS and PCS are represented by the same counsel in the arbitrations each company has pursued against former employees.

### ACS's Demands in Violation of the FLSA

71.     ACS recruited Vidal from the Philippines to work as a registered nurse in the United States.

72.     On January 4, 2022, shortly before Vidal moved to the United States to work for ACS, Klein sent Vidal a letter on ACS's behalf, presenting Vidal with a new contract.

73.     The 2022 contract superseded an earlier contract between ACS and Vidal (which had contained a $20,000 liquidated damages clause in the event Vidal stopped working for ACS prior to the end of a three-year contract term).

74.     Klein's letter stated that some of the changes in the 2022 contract were based on "feedback" that ACS had "received."

75.     On information and belief, ACS amended its prior form contract because it understood there was a significant risk that a court would determine the liquidated damages clause to be unenforceable, including under the Trafficking Victim Protections Act.

76.     Klein's letter warned that rather than the $20,000 liquidated damages clause, the new contract "allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version)."

77.     Vidal had been waiting since 2019 to begin working for ACS and at the time he received Klein's January 4, 2022 letter, had recently left his job in anticipation of soon moving to the United States to work for ACS.

78.     Believing that he had no choice, Vidal signed the 2022 contract.

79.     ACS's 2022 contract stated that ACS intended to recover "loss of anticipated profits" from Vidal if he left prior to the end of a three-year contract term, among other possible claimed damages, subject to a starkly limited exception for a departure for "Good Reason."

80.     ACS defined Good Reason only as a material failure by ACS of its contractual obligation to pursue an employment-based visa or failure to pay required wages—subject to Vidal providing 35 days' written notice of such a breach.

81.     Under ACS's contract, an employee's good-faith concern that working conditions presented a risk of serious harm to patients or employees was not a "Good Reason" for resignation.

82.     ACS's 2022 contract provided that as "a condition of" employment, nearly any dispute between ACS and Vidal "shall be resolved by arbitration," and stated that Vidal waived his right to sue in court and have a jury trial.

83.     ACS's 2022 contract stated that arbitration would be administered by the American Arbitration Association (AAA) under its Commercial Arbitration Rules.

84.     ACS's 2022 contract warned that "the prevailing party shall be entitled . . . to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator." The contract further provided that Vidal "shall reimburse [ACS] for all reasonable costs, including all attorneys' fees that Employer incurs in enforcing its rights and remedies."

85.     Klein signed the 2022 contract on behalf of ACS.

86.     On information and belief, ACS has entered into substantially similar contracts with numerous other ACS employees.

87.     Vidal began to work for ACS at Downtown Brooklyn Nursing and Rehabilitation Center on or about March 8, 2022.

88.     Downtown Brooklyn Nursing and Rehabilitation Center is owned in part by one of ACS's managing members.

89.     While employed by ACS as a registered nurse, Vidal presented complaints about safety, both to ACS and to Downtown Brooklyn Nursing and Rehabilitation Center.

90.     Vidal grew deeply concerned that he could not meet his ethical and professional responsibilities under ACS's working conditions, including a heavy patient load that he believed in good faith did not permit him to provide adequate patient care.

91.     Following repeated bouts of illness working under grueling conditions, and faced with a good-faith belief that he could not continue to work under conditions that he understood were inconsistent with his ethical and professional responsibilities, Vidal notified ACS on June 15, 2022 of his intent to resign effective June 29.

92.     Vidal's e-mail reiterated his serious safety concerns associated with the conditions under which ACS had assigned him to work. He also referred to adverse physical and mental health effects he believed he suffered from working under those conditions.

93.     ACS responded to Vidal's e-mail sixteen minutes later, without addressing his safety or health concerns. Instead, the supervisor responding on ACS's behalf asserted in conclusory terms that ACS had satisfied all obligations to Vidal.

94.     The next day, the ACS supervisor shared the e-mail thread with Klein.

95.     Soon thereafter, on June 22, ACS's outside legal counsel sent Vidal a letter on ACS's behalf, demanding that Vidal continue to work on ACS's behalf so that they could continue profiting from his labor.

96.     ACS's June 22 letter also threatened that if Vidal stopped working, ACS would initiate an arbitration, begin to incur arbitration costs and attorneys' fees, and seek to recover these amounts (as well as others) from Vidal.

97.     ACS's June 22 letter warned that it would seek, in future profits alone, over $9,000 per year from Vidal through March 2026—a total of more than $24,000.

98.     The $9,000 per year figure did not include the associated costs of the arbitration and ACS's attorneys' fees, which ACS also demanded (among yet other costs).

99.     The $24,000 or more in demanded future profits was alone almost equivalent to, if not more than, the amount that Defendants paid Vidal in gross wages during his entire period of employment with ACS.

100.    Vidal last worked for Defendants on or about June 29, 2022.

101.    ACS filed an arbitration demand against Vidal on July 8, 2022.[1]

102.    ACS's arbitration petition against Vidal demanded future "lost profits," attorneys' fees, cost of arbitration, and interest (in addition to yet other claimed costs).

103.    ACS incurred a $1,900 filing fee and $750 case management fee in connection with the arbitration against Vidal that ACS initiated with the AAA.

104.    The hourly rate of the arbitrator appointed to hear ACS's demand is $450 per hour.

---

[1] In an action that remains pending before the Honorable Nina R. Morrison, *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-5535-NRM-MMH (filed Sept. 16, 2022), Vidal sought a declaratory judgment that the arbitration provision is unenforceable, including on the ground that ACS's attempt to recoup future profits, attorneys' fees, and costs would reduce his wages below the FLSA minimum in his last week of employment. Following briefing and oral argument, Judge Morrison granted Vidal's opposed motion for a preliminary injunction, temporarily pausing the pending arbitration while the Court adjudicates Vidal's challenge to the enforceability of the arbitration provision. Order Granting Pl.'s Mot. for Preliminary Injunction, *id.*, ECF No. 39 (Feb. 24, 2023); Opinion & Order, *id.*, ECF No. 42 (Apr. 4, 2023), *appeal pending*, No. 23-303 (2d Cir. opening brief filed July 5, 2023).

105.    In his last week of work for ACS, for the period beginning June 26, 2022, Defendants paid Vidal $839.04 in gross wages, for 22.08 hours of work, according to ACS's payroll. From that amount, ACS withheld amounts for taxes and various deductions.

106.    Defendants' demand that Vidal kick back his wages to satisfy ACS's future profits through March 2026, together with ACS's attorneys' fees and arbitration costs, plus interest, would bring Vidal below the FLSA minimum wage during his final workweek.

107.    In the alternative, on information and belief, Defendants' demand that Vidal kick back his wages to satisfy ACS's future profits through March 2026, together with ACS's attorneys' fees and arbitration costs, plus interest, would bring Vidal below the FLSA minimum wage and required overtime rate (in overtime workweeks) for his entire period of employment with ACS.

108.    According to ACS's payroll, Vidal worked for ACS for a total of 512.51 hours.

109.    According to ACS's payroll, ACS paid Vidal $20,372.90 in gross wages (before tax withholdings and other deductions) for his entire period of employment.

110.    The week ending April 9, 2022, according to ACS's payroll, Vidal worked 40.75 hours, at an hourly rate of $36 in that week (before overtime premium). ACS paid Vidal $1,480.50 in gross wages for those hours, and withheld amounts for taxes and various deductions.

111.    In violation of the FLSA, ACS and Klein failed to pay Vidal his wages free and clear in each week that they employed him.

112.    ACS and Klein have a policy and practice of entering into contracts with employees with identical or substantially similar contract provisions to the 2022 contract with Vidal.

113.    On information and belief, ACS has followed through on those contracts by clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA.

14

## PCS'S DEMANDS IN VIOLATION OF THE FLSA

114.    ACS and PCS share the same international department, recruiting nurses in the

Philippines to work for both Companies at an overlapping set of medical facilities in the United

States.

115.    The Staffing Companies recruited Miclat from the Philippines to work as a

registered nurse in the United States.

116.    The Staffing Companies assured Miclat that she would receive sufficient support

and training for her work in the United States.

117.    On June 25, 2019, Miclat first signed a contract with ACS.

118.    ACS's 2019 contract included a liquidated damages clause requiring Miclat to pay

$20,000 if she stopped working for the Staffing Companies prior to the end of a three-year contract

term.

119.    In February 2020, the Staffing Companies asked Miclat to sign a new contract, with

PCS instead of ACS.

120.    E-mailing from an Advanced Care Staffing account, an ACS/PCS employee

explained that "[h]aving a similar management," the two Companies "follow the same provision[s]

and we apply the same terms and conditions." The ACS/PCS employee further explained that the

Staffing Companies selected Miclat "to be put under Priority Care" "to speed up the" visa filing

process.

121.    PCS's 2020 contract contained substantively identical terms as the original 2019

ACS contract, including the $20,000 liquidated damages clause.

122.    On November 19, 2021, Klein sent Miclat a letter on PCS's behalf, presenting

Miclat with yet another contract.

123.     The November 19, 2021 letter was virtually identical to the January 4, 2022 letter that Klein sent to Vidal on ACS's behalf, but on PCS letterhead.

124.     PCS's 2021 contract states that it replaces a prior June 25, 2019 contract.

125.     PCS's 2021 contract contains terms identical to ACS's 2022 contract with Vidal.

126.     As in his letter to Vidal, Klein's letter to Miclat stated that some of the changes in the earlier contract were based on "feedback" that PCS had "received."

127.     On information and belief, PCS, like ACS, amended its prior form contract because it understood there was a significant risk that a court would determine the liquidated damages clause to be unenforceable, including under the Trafficking Victim Protections Act.

128.     Klein's letter warned that rather than the $20,000 liquidated damages clause, the new contract "allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version)."

129.     Miclat had been waiting since 2019 to begin working for the Staffing Companies by the time she received Klein's November 19, 2021 letter, had already signed two previous contracts with the Staffing Companies among other paperwork, and had completed numerous interviews and briefings.

130.     Understanding that she had no choice if she wanted to work in the United States, Miclat signed the 2021 contract.

131.     PCS's 2021 contract stated that PCS intended to recover "loss of anticipated profits" from Miclat if she left prior to the end of a three-year contract term, among other possible claimed damages, subject to a narrowly limited exception for a departure for "Good Reason."

132.    PCS defined Good Reason only as a material failure by PCS of its contractual obligation to pursue an employment-based visa or failure to pay required wages—subject to Miclat providing 35 days' written notice of such a breach.

133.    Under PCS's contract, an employee's good-faith concern that working conditions presented a risk of serious harm to patients or employees was not a "Good Reason" for resignation.

134.    PCS's 2021 contract provided that as "a condition of" employment, nearly any dispute between PCS and Miclat "shall be resolved by arbitration," and stated that Miclat waived her right to sue in court and have a jury trial.

135.    PCS's 2021 contract stated that arbitration would be administered by the AAA under its Commercial Arbitration Rules.

136.    PCS's 2021 contract warned that "the prevailing party shall be entitled . . . to be reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator." The contract further provided that Miclat "shall reimburse [PCS] for all reasonable costs, including all attorneys' fees that Employer incurs in enforcing its rights and remedies."

137.    Klein signed the 2021 contract on behalf of PCS.

138.    On information and belief, PCS has entered into substantially similar contracts with numerous other PCS employees.

139.    Miclat began to work for PCS at Morningside Nursing and Rehabilitation Center ("MNRC") on or about March 1, 2022.

140.    Despite PCS's promises of adequate support and training, Miclat quickly received an enormous workload with insufficient help and minimal training.

141.    MNRC was severely understaffed, so she was assigned to cover work in areas, and to perform medical procedures, for which she lacked sufficient experience or training. When

17

Miclat complained that she had never performed a particular procedure, her MNRC supervisor told her to "just do it."

142.    Miclat also expressed concerned about the inadequate COVID protocols at MNRC. When working in a unit with mixed COVID positive and negative patients, the facility did not require consistent use of personal protective equipment.

143.    MNRC also frequently pressured her to extend her already long shifts, and to come into work on her days off. Because MRNC was so understaffed, Miclat felt it was difficult to refuse requests for extra shifts, out of concern for the consequence for patients, many of whom were at risk of falling and suffered from dementia.

144.    At one point, Miclat went to the emergency room on her day off because of symptoms caused by the stress of her work and underwent an endoscopy. Shortly after the endoscopy, while she was still recovering, MNRC pressured her to come in to work an extra shift, even after she explained that she had just underwent an endoscopy and was feeling dizzy. Only because she was still recovering from the procedure did Miclat believe she could refuse MRNC's pressure to work an extra shift that day.

145.    Miclat presented repeated complaints about the unsafe and unreasonable conditions at MNRC both to PCS and MNRC staff, to no avail.

146.    For example, Miclat expressed concern to MRNC's Administrator that insufficient staffing levels created risks both for patient safety and nurses' professional licenses.

147.    Miclat advised PCS of her good-faith concern that MRNC's staffing levels jeopardized patient safety and could put Miclat's professional license at risk.

148.    Miclat received no meaningful response from MRNC or PCS regarding her safety and staffing concerns.

18

149.    At one point, in an attempt to propose a solution to PCS that would not require any training (since PCS and MRNC failed to provide it), Miclat requested a transfer to a dialysis center, since she had experience working in that kind of facility. PCS eventually responded that they did not have any contracts with dialysis facilities.

150.    Eventually, Miclat requested that PCS transfer her to any other facility, but PCS did not respond.

151.    Miclat believed that she could not provide adequate patient care at her PCS assignment given the unreasonable patient load and inadequate support and training, and PCS's inattention to her good-faith safety concerns. She worried that she would not be able to meet her ethical and professional responsibilities under PCS's working conditions.

152.    Miclat did not want to stop working for PCS. But due to PCS's failure to improve her working conditions, she felt that staying could mean endangering her medical license.

153.    Miclat resigned on or about October 27, 2022.

154.    Miclat last worked for Defendants the week ending November 19, 2022.

155.    PCS filed an arbitration demand against Miclat on December 5, 2022.[2]

156.    PCS's arbitration petition against Miclat demanded future "lost profits," attorneys' fees, cost of arbitration, and interest (in addition to yet other claimed costs).

157.    PCS incurred a $2,200 filing fee in connection with the arbitration against Vidal that ACS initiated with the AAA. If the arbitration proceeds, PCS will also incur a $750 case management fee.

---

[2] On March 7, 2023, PCS consented to stay the arbitration pending resolution of *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-5535-NRM-MMH (filed Sept. 16, 2022).

158.    The potential arbitrators offered by AAA to hear PCS's demand have hourly rates ranging from $475 to $875 per hour, or daily rates from $2,500 to $5,000 per day.

159.    In her last week of work for PCS, the week ending November 19, 2022, Defendants paid Miclat $1,385.10 in gross wages for 36.45 hours of work, according to PCS's payroll (in addition to paid sick leave). From that amount, PCS withheld amounts for taxes and various deductions.

160.    PCS and Klein's demand that Miclat kick back her wages to satisfy PCS's future profits through February 2025, together with PCS's attorneys' fees and arbitration costs, plus interest, would bring Miclat below the FLSA minimum wage during her final workweek.

161.    In the week ending June 25, 2022, according to PCS's payroll, Miclat worked 65.74 hours, at an hourly rate of $38 in that week (before overtime premium). PCS paid Miclat $2,987.18 in gross wages for those hours, and withheld amounts for taxes and various deductions.

162.    The week ending July 23, 2022, according to PCS's payroll, Miclat worked 65.87 hours, at an hourly rate of $38 that week (before overtime premium). PCS paid Miclat $2,994.59 in gross wages for those hours, and withheld amounts for taxes and various deductions.

163.    In the week ending November 12, 2022, according to PCS's payroll, Miclat worked 51.35 hours, at an hourly rate of $38 in that week (before overtime premium). PCS paid Miclat $2,166.95 in gross wages for those hours, and withheld amounts for taxes and various deductions.

164.    In violation of the FLSA, PCS and Klein failed to pay Miclat her wages free and clear in each week that they employed her.

165.    PCS and Klein have a policy and practice of entering into contracts with employees with identical or substantially similar contract provisions to the 2021 contract with Miclat.

166.     On information and belief, PCS has followed through on those contracts by clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA.

### FIRST CAUSE OF ACTION
### Violation of Sections 6(a) and 15(a)(2) of the FLSA
### Failure to Pay Minimum Wage

167.     The Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 to 166 of the complaint.

168.     Defendants have violated Sections 6 and 15(a)(2) of the Act. Their demands, including in arbitration, that employees pay ACS's anticipated future profits and associated arbitration costs and attorneys' fees, are an illegal request that employees kick back wages to ACS that would bring employees' pay below the FLSA minimum, and/or are a failure to pay employees, finally and unconditionally or free and clear, at least the minimum wage guaranteed by the Act for all hours worked.

169.     Therefore, Defendants are liable to their employees for unpaid minimum wages and an equal amount in liquidated damages under Section 16(c) of the Act or, in the event liquidated damages are not awarded, unpaid minimum wages and prejudgment interest under Section 17 of the Act.

### SECOND CAUSE OF ACTION
### Violation of Sections 7(a) and 15(a)(2) of the FLSA
### Failure to Pay Overtime

170.     The Secretary incorporates by reference and re-alleges the allegations in paragraphs 1 to 166 of the complaint.

171.     Defendants have violated the provisions of Sections 7 and 15(a)(2) of the Act. Their demands, including in arbitration, that employees pay ACS's anticipated future profits and

associated arbitration costs and attorneys' fees, are an illegal request that employees kick back wages to ACS, and/or are a failure to pay employees, finally and unconditionally or free and clear, the wages required by the Act for all hours worked in overtime workweeks. Defendants' demands would bring employees' wages below the amount required by Section 7 of the Act, which provides that in any workweeks longer than forty hours, Defendants must compensate employees at a rate of not less than one and one-half times the regular rate at which they were employed.

172.    Therefore, Defendants are liable to their employees for unpaid overtime compensation and an equal amount in liquidated damages under Section 16(c) of the Act or, in the event liquidated damages are not awarded, unpaid overtime compensation and prejudgment interest under Section 17 of the Act.

**WHEREFORE**, cause having been shown, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

1.  A declaration that it violates the FLSA for Defendants to demand, threaten, attempt to contractually obligate or enforce, or otherwise require, employees or former employees to pay to Defendants costs that Defendants are prohibited from shifting to employees, including but not limited to "lost profits," attorneys' fees, and arbitration costs, such that would reduce employees' wages below the levels required by FLSA;

2.  An injunction issued pursuant to Section 17 of the Act permanently restraining Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with Defendants, from violating the provisions of Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5) of the Act, including by doing or attempting any of the following: (1) requiring, (2) obligating, (3) threatening, (4) demanding, or (5) enforcing contractual terms, that employees or former employees pay to Defendants costs that Defendants are

prohibited from shifting to employees, including but not limited to "lost profits," attorneys' fees, and arbitration costs, that would reduce employees' wages below the levels required by the FLSA;

3. An order pursuant to Section 16(c) of the Act finding Defendants liable for unpaid minimum wage and overtime wage compensation found due Defendants' former employees (including Benzor Shem Vidal and Cherry Lyn Miclat), and an equal amount of liquidated damages (additional back wage compensation and liquidated damages may be owed to additional employees for the period covered by this Complaint); or

4. In the event liquidated damages are not awarded, for an injunction issued pursuant to Section 17 of the Act restraining Defendants, their officers, agents, employees, and those persons in active concert or participation with Defendants, from withholding the amount of unpaid minimum wage and overtime compensation found due Defendants' former employees (including Benzor Shem Vidal and Cherry Lyn Miclat); additional back wage compensation may be owed to additional employees for the period covered by this Complaint), and prejudgment interest computed at the underpayment rate established by the Secretary of Treasury pursuant to 26 U.S.C. § 6621;

5. An order compelling Defendants to reimburse the Secretary for the costs of this action; and

6. An order granting such other relief as the Court may deem necessary or appropriate.

DATED:     July 20, 2023
               New York, New York

SEEMA NANDA
Solicitor of Labor

JEFFREY S. ROGOFF
Regional Solicitor

BY:   /s/ Jason E. Glick
      JASON E. GLICK
      Senior Trial Attorney
      (he/him/his)

/s/ Alexander M. Kondo
ALEXANDER M. KONDO
Senior Trial Attorney
(he/him/his)

U.S. Department of Labor,
*Attorneys for Plaintiff Secretary of Labor*

U.S. Department of Labor
Office of the Regional Solicitor
201 Varick Street, Room 983
New York, NY 10014
(646) 264-3650
(646) 264-3660 (fax)
glick.jason.e@dol.gov
kondo.alexander.m@dol.gov
ny-sol-ecf@dol.gov

24