IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| JULIE A. SU, | : | No. 1:23-cv-02119 (NRM) (MMH) |
| Acting Secretary of Labor, | : | |
| United States Department of Labor | : | |
| | : | |
| *Plaintiff*, | : | Hon. Nina R. Morrison |
| | : | |
| -against- | : | **Oral Argument Requested** |
| | : | |
| ADVANCED CARE STAFFING, LLC, | : | |
| PRIORITY CARE STAFFING, LLC, and | : | |
| SAMUEL KLEIN, | : | |
| *Defendants*. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ADVANCED CARE
STAFFING, LLC, PRIORITY CARE STAFFING, LLC, AND SAMUEL KLEIN'S
NOTICE OF MOTION TO DISMISS THE AMENDED COMPLAINT UNDER
<u>FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)</u>**

Date of Service: August 24, 2023

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

A.   ACS and Vidal .................................................................................................. 3

B.   PCS and Miclat ................................................................................................ 6

ARGUMENT ................................................................................................................. 9

I.   DOL Lacks Article III Standing to Bring its Claims Because it Alleges No Concrete and Particularized Harm. ................................................................................. 9

II.   DOL's Amended Complaint Fails to State a Plausible Claim for Violating the FLSA Because DOL Has Not Alleged That Any Employee Actually Received Less Than the Mininum Wage or Overtime Wage .......................................................... 14

III.   Potential Damages for Breach of Contract Are Not "Kickbacks" of Earned Wages. ....... 18

CONCLUSION .............................................................................................................. 30

## **TABLE OF AUTHORITIES**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................................................9

*Bland v. Edward D. Jones & Co., L.P.,*
    No. 18-CV-1832, 2020 WL 1503574 (N.D. Ill. Mar. 30, 2020) ............................................19

*Bland v. Edward D. Jones & Co., L.P.,*
    375 F. Supp. 3d 962 (N.D. Ill. 2019) ....................................................................................17

*Broidy Cap. Mgmt. LLC v. Benomar,*
    944 F.3d 436 (2d Cir. 2019) ..................................................................................................10

*Brooklyn Sav. Bank v. O'Neil,*
    324 U.S. 697 (1945) ..................................................................................................................1

*In re Chembio Diagnostics, Inc. Secs. Litig.,*
    586 F. Supp. 3d 199 (E.D.N.Y. 2022) ....................................................................................9

*Chung v. Igloo Products Corp.,*
    No. 20-CV-4926 (MKB), 2022 WL 2657350 (E.D.N.Y. July 8, 2022) .................................13

*Clapper v. Amnesty Intern., USA,*
    568 U.S. 398 (2013) ................................................................................................................12

*Cohen v. Cap. One Funding, LLC,*
    489 F. Supp. 3d 33 (E.D.N.Y. 2020) ......................................................................................3

*Deng v. Frequency Electronics, Inc.*
    No. 21-CV-6081 (BMC), 2022 WL 16923999 (E.D.N.Y. Nov. 14, 2022) ............................26

*Gilbert v. Indeed, Inc.,*
    513 F. Supp. 3d 374 (S.D.N.Y. 2021) ...................................................................................26

*Glatt v. Fox Searchlight Pictures, Inc.,*
    811 F.3d 528 (2d Cir. 2016) ..................................................................................................14

*Gordon v. City of Oakland,*
    627 F.3d 1092 (9th Cir. 2010) ....................................................................................20, 22, 24, 25

*Heder v. City of Two Rivers, Wis.,*
    295 F.3d 777 (7th Cir. 2002) ..........................................................................20, 22, 23, 24, 25

*Heuberger v. Smith*,
No. 3:16-CV-386-JD-JEM, 2017 WL 3923271 (N.D. Ind. Sept. 7, 2017)............................17

*Hoeffner v. D'Amato*,
605 F. Supp. 3d 467 (E.D.N.Y. 2022) .......................................................................9

*Isbell v. City of New York*,
316 F. Supp. 3d 571 (S.D.N.Y. 2018).......................................................................10

*Ketner v. Branch Banking & Trust Co.*,
143 F. Supp. 3d 370 (M.D.N.C. 2015) .........................................20, 21, 22, 23, 24

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991)....................................................................................5

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*,
570 F.3d 471 (2d Cir. 2009)....................................................................................9

*LeDeatte v. Horizon Media*,
571 F. Supp. 3d 72 (S.D.N.Y. 2021)......................................................................26

*Lopez-Serrano v. Rockmore*,
132 F. Supp. 3d 390 (E.D.N.Y. 2015) ..............................................................14, 15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...............................................................................................10

*Lundy v. Cath. Health Sys. of Long Island Inc.*,
711 F.3d 106 (2d Cir. 2013)....................................................................................14

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000).................................................................................9, 10

*Marcial v. New Hudson Fam. Rest. Inc.*,
No. 7:18-CV-0663 (NSR)(JCM), 2019 WL 1900336 (S.D.N.Y. Apr. 29, 2019) ...................17

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007).....................................................................................3

*McClain v. Cape Air*,
No. 22-CV-10649-DJC, 2023 WL 3587284 (D. Mass. May 22, 2023) ....20, 21, 22, 23, 24, 25

*Mendoza v. Edge*,
615 F. Supp. 3d 163 (E.D.N.Y. 2022) .....................................................................10

*Milford v. Roehl Transp., Inc.*,
No. 22-CV-0879-BHL, 2023 WL 2503495 (E.D. Wis. Mar. 14, 2023)................................20

*Moore v. Ashcroft*,
   251 F.3d 919 (11th Cir. 2001) ........................................................................25

*Morangelli v. Chemed Corp.*,
   922 F. Supp. 2d 278 (E.D.N.Y. 2013) ...........................................................18

*Nwolise v. U.S. I.N.S.*,
   4 F.3d 306 (4th Cir. 1993) ..............................................................................25

*Park v. FDM Grp. (Hldgs.) PLC*,
   No. 16-CV-1520-LTS, 2017 WL 946298 (S.D.N.Y. Mar. 9, 2017)...............18, 19, 24, 25, 28

*Rodriguez-Depena v. Parts Auth., Inc.*,
   877 F.3d 122 (2d Cir. 2017)............................................................................26

*Route v. Garland*,
   996 F.3d 968 (9th Cir. 2021) ..........................................................................25

*Serrano v. I. Hardware Distribs., Inc.*,
   No. 14-CV-2488 PAC, 2015 WL 4528170 (S.D.N.Y. July 27, 2015) ...................14

*Solis v. SCA Rest. Corp.*,
   938 F. Supp. 2d 380 (E.D.N.Y. 2013) .............................................................2

*Sosa v. N.Y.C. Dep't of Educ.*,
   368 F. Supp. 3d 489 (E.D.N.Y. 2019) .............................................................5

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)........................................................................................10

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
   425 F.3d 119 (2d Cir. 2005)............................................................................4

*Sulieman v. Igbara*,
   599 F. Supp. 3d 113 (E.D.N.Y. 2022) .............................................................4

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)........................................................................................12

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020)....................................................................................10

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)...............................................................................10, 12

*Vidal v. Advanced Care Staffing, LLC*,
   No. 22-cv-5535-NRM-MMH (filed Sept. 16, 2022) .....................................5, 8

*Viking River Cruises, Inc. v. Moriana*,
 142 S. Ct. 1906 (2022) ................................................................................ 27

*Walsh v. Lalaja, Inc.*,
 565 F. Supp. 3d 766 (E.D.N.C. 2021) .................................................. 16, 17

**STATUTES AND REGULATIONS**

29 U.S.C. § 206 ............................................................................................. 14

29 U.S.C. § 207 ............................................................................................. 14

29 U.S.C. § 216 ............................................................................................... 2

29 C.F.R. § 531.35 ................................................................................... 18, 29

**OTHER AUTHORITIES**

Jonathan F. Harris, *Unconscionability in Contracting for Worker Training*,
 72 ALA. L. REV. 723 (2021) ........................................................................ 24

Stuart Lichten & Eric M. Fink, *"Just When I Thought I Was Out . . . ." Post Employment Repayment Ogligations*, 25 WASH. & LEE J. CIVIL RTS. & SOC. JUST. 51 (2018) ................... 24

Pamela Kemp Parker, *Meeting the Citizenship and Immigration Needs of Foster Children*,
 NO. 11 CHILD L. PRAC. 129, 134 (2012) ..................................................... 25

U.S. DEP'T OF HOMELAND SECURITY, *Lawful Permanent Residents (LPR),* (FEB. 13, 2023),
 HTTPS://BIT.LY/3CFFWXC ........................................................................... 25

Advanced Care Staffing, LLC ("ACS"), Priority Care Staffing, LLC ("PCS", and together with ACS, the "Employers"), and Samuel Klein ("Klein," and collectively with ACS and PCS, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Department of Labor's ("DOL") amended complaint (the "Amended Complaint" or "Am. Compl."), ECF No. 19, with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

Congress, through the Fair Labor Standards Act, created a cause of action to permit employees, and DOL, to hold accountable employers who fail to pay minimum wage or overtime wages.  Congress intended the FLSA to "protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce."  *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945).  In this case, DOL's unprecedented Amended Complaint pushes the boundaries of the FLSA to extremes far beyond what Congress intended.  DOL seeks to interfere with valid and enforceable employment contracts under the guise of protecting employees even though DOL has not, and cannot, allege that Defendants paid substandard wages or required employees to work excessive hours.

Instead, DOL advances the novel and untenable theory that the mere *existence* of an agreement to arbitrate claims arising from an employee's employment constitutes an FLSA violation on the theory that *any* damage award that *might* be made by an arbitrator (and any amount that might otherwise be paid by an employee as damages for breach), somehow constitutes an illegal "kickback" of earned wages.  Based on these hypothetical future FLSA violations, which are themselves premised on a flawed interpretation of what constitutes a "kickback," DOL seeks sweeping and unprecedented relief that has no support in the law.

1

As a threshold matter, DOL's Amended Complaint must be dismissed because DOL lacks standing under Article III of the United States Constitution to assert claims related to hypothetical future injuries.  Specifically, DOL cannot meet its burden to establish that it has suffered an injury in fact – a necessary element of Article III's case or controversy requirement.[1]  DOL fails to establish Benzor Shem Vidal and Cherry Lyn Miclat (the "Individual Employees") – the only former employees about whom DOL provides any factual allegations – or any other employees actually suffered an injury.  DOL does not allege that the Individual Employees have paid even a penny to the Employers, and certainly not that the Individual Employees have paid the Employers enough money to bring their minimum wage and overtime compensation below the FLSA-required minimums.  Further, because the Individual Employees have never been ordered to pay the Employers anything (indeed, the parties have not even had a chance to fully present their claims and defenses in arbitration), there is no current threat that the Individual Employees would have to pay the Employers *at all*, let alone an amount that could theoretically constitute an FLSA violation.  Because the Individual Employees have experienced no losses, DOL cannot establish the requisite injury in fact to establish constitutional standing.

For the same reason, DOL fails to plausibly allege that Defendants did not pay employees the FLSA-required minimum wage and overtime wages.  Rather than pleading facts showing Defendants caused employees' wages to fall below the FLSA floor, DOL instead relies on hypothetical potential future harm that *might* occur if and when an employee is required to pay contractual damages to the Employers under DOL's flawed "kickback" theory.  Such deficient

---

[1] "The FLSA grants the Secretary of Labor the right 'to bring an action by or on behalf of any employee' to recover unpaid minimum wages or overtime compensation."  *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 394 (E.D.N.Y. 2013) (quoting 29 U.S.C. § 216(c)).  Because DOL has brought this action on behalf of the Individual Employees (and purportedly on behalf of other unidentified Employers' employees), this memorandum refers to employees' harm and DOL's harm interchangeably.

pleading sinks DOL's case.  The possibility that future conduct may result in a statutory violation – even if the conduct does not constitute a violation under existing legal principles – is insufficient to secure relief today.  DOL's Amended Complaint fails as a matter of law and should be dismissed.

Finally, DOL's Amended Complaint should be dismissed because the entire theory on which DOL's unripe case is premised – that Defendants' potential recovery of breach of contract damages based on an arbitrator's future award made in accordance with applicable law, constitutes a "kickback" under the FLSA – is meritless.  Potential breach of contract damages, like any other damages either the Employers or their employees may suffer, do not constitute a kickback as a matter of law.  Accordingly, DOL's Amended Complaint fails and should be dismissed.

## **FACTUAL BACKGROUND**[2]

### A.    **ACS and Vidal**

ACS is a staffing agency that recruits and places healthcare workers in healthcare facilities in New York, New Jersey, and Connecticut.  Am. Compl. ¶ 47.  ACS has employed hundreds of American and international healthcare workers and places them in nursing and healthcare facilities to provide needed patient care.  *Id.* ¶¶ 51–52.  One of those hundreds of employees was Benzor Shem Vidal, a nurse ACS recruited from the Philippines.  *Id.* ¶ 71.

Vidal and ACS entered an employment contract through which ACS agreed to provide substantial benefits and assistance to Vidal as he moved to the United States.  *See generally* Vidal Employment Agreement, attached as Exhibit A.[3]  The agreement included ACS preparing and

---

[2] For the purposes of this Motion, Defendants are required to accept as true DOL's well-pled factual allegations.  *See Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 43 (E.D.N.Y. 2020) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)).

[3] "In determining the adequacy of the complaint," the Court may consider Vidal's employment agreement as it is "incorporated in the complaint by reference," and a "document[ ] upon which the complaint relies

submitting a petition for an Employment-Based Immigrant Visa on Vidal's behalf and paying all

fees associated with filing the petition. *Id.* at 3, § 3(a). ACS also agreed to advance or reimburse

the following costs to Vidal:

- The costs of a nursing review course identified by ACS;
- The costs of initial professional licensing;
- The costs of credentialing;
- The costs of visa screens;
- The costs of the NCLEX nurse licensing examination; and
- The costs of an English-language proficiency examination.

*Id.* at 4, § 4(a). Further, ACS agreed to provide to Vidal a plane ticket to New York City, thousands

of dollars in a housing allowance, hundreds of dollars in gift cards for groceries, and a monthly

pass for local public transportation. *Id.* § 4(b). In return for these substantial benefits, which

enabled Vidal both to come to the United States to work and to become a lawful permanent resident

of the United States, Vidal agreed to work for ACS for three years (or an hourly equivalent). *Id.*

The employment contract, like many employment contracts, included an arbitration

provision through which Vidal and ACS agreed to arbitrate any disputes either party may have

arising out of the agreement. *Id.* at 12–13. The employment contract provided that if Vidal

terminated his employment without "Good Reason" (as defined in the Employment Agreement),

ACS would be "entitled to all damages and other relief to redress the harm caused by the failure

of" Vidal to fulfill his obligations. *Id.* at 7, § 10(a)(1). Likewise, if ACS breached the employment

contract, Vidal could seek damages against ACS in arbitration. *Id.* at 12. Further, the prevailing

party would be entitled to reasonable attorneys' fees. *Id.* In evaluating any claims – including

claims for damages brought by ACS against Vidal or vice versa – the arbitrator would be bound

by applicable law. *Id.*

---

and which [is] integral to the complaint." *Sulieman v. Igbara*, 599 F. Supp. 3d 113, 120 (E.D.N.Y. 2022)
(citing *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

After a few months of work, Vidal breached his employment contract by resigning from ACS without Good Reason.  *See* Am. Compl. ¶¶ 87, 100; *see also* Ex. A at 7, § 10(a)(2).  Before ACS commenced arbitration proceedings against Vidal, consistent with the employment contract he signed, ACS told him that ACS' "damages [will] ultimately be determined by an arbitrator pursuant to the Agreement."  *See* ACS' June 22, 2022 letter to Vidal, attached as Exhibit B, at 1.[4] Contrary to DOL's allegation, ACS did not assert it would seek $9,000 in future profits from Vidal; rather, it explained that "given the current market conditions, recruiting and hiring a replacement nurse(s) is expected to cost over $9,000 dollars per year over the remainder of your three-year term."  *See* Ex. B at 1–2; *cf.* Am. Compl. ¶¶ 97–99.[5]  Indeed, Defendants never asked Vidal to pay any specific sum.  Eventually, ACS commenced arbitration proceedings against Vidal.  That arbitration has been stayed, so there have been no arbitral findings or arbitration award of any damages.[6]

While employed by ACS, Vidal earned $20,372.90 in gross wages.  Am. Compl. ¶ 109.  In one of the weeks he worked for ACS, Vidal worked 40.75 hours, for which ACS paid Vidal $1,480.50 in gross wages – an hourly rate of $36/hour.  *Id.* ¶ 110.  During his last (incomplete) week of work for ACS, Vidal worked 22.08 hours for which ACS paid Vidal $839.04 – an hourly

---

[4] The Court may consider ACS' letter to Vidal for the same reason it may consider Vidal's employment contract – it is a document upon which DOL's Amended Complaint relies and which is integral to it's Amended Complaint. *See supra* note 3.

[5] "The Court is not required to accept as true the allegations in the Complaint, in the face of documents that state otherwise."  *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 524 (E.D.N.Y. 2019).

[6] As DOL noted in its Amended Complaint, Vidal sought a declaratory judgment that the arbitration provision is unenforceable.  *See* Am. Compl. ¶ 101 n.1 (citing *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-5535-NRM-MMH (filed Sept. 16, 2022)).  The Court preliminarily enjoined the arbitration, *see Vidal* ECF No. 39, and ACS has filed its notice of appeal to the U.S. Court of Appeals for the Second Circuit, *see Vidal* ECF No. 40.  The Court may properly take judicial notice of the docket entries in the *Vidal* litigation. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.").

rate of $38/hour.  *Id.* ¶ 105.  DOL does not allege that ACS improperly deducted or withheld any amount from Vidal's wages, or that Vidal has paid ACS any amount as monetary damages or as a settlement, because he has not.

Although the Amended Complaint focuses almost exclusively on Vidal's employment relationship with ACS (and Miclat's employment with PCS, as discussed below), DOL amorphously alleges that "[o]n information and belief, ACS has entered into substantially similar contracts with numerous other ACS employees," and that "[o]n information and belief, ACS has followed through on those contracts by clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA."  *Id.* ¶¶ 86, 113; *see also* Section B, *infra*. The Amended Complaint does not identify other ACS employees, whether those employees were subject to the 2022 employment agreement, whether those employees left ACS, what (if any) claims Defendants have asserted against those employees in letters or arbitration demands, whether their claims were arbitrated, how many hours they worked, how much they were paid, or how much they allegedly returned to ACS.

**B.    PCS and Miclat**

PCS is a staffing agency that recruits and places healthcare workers in healthcare facilities in California, Florida, Illinois, New York, and Washington.  Am. Compl. ¶ 56.  PCS employs American and international healthcare workers and places them in nursing and healthcare facilities where they provide needed patient care.  *Id.* ¶ 60.  One of PCS' former employees was Cherry Lyn Miclat, a nurse PCS recruited from the Philippines.  *Id.* ¶ 115.

Miclat and PCS entered an employment contract, through which PCS agreed to provide substantial benefits and assistance to Miclat as she moved to the United States. *See generally* Miclat Employment Agreement, attached as Exhibit C.[7]   This included PCS preparing and submitting a petition for an Employment-Based Immigrant Visa on Miclat's behalf and paying all fees associated with filing the petition. *Id.* at 2, § 3(a).  PCS also agreed to advance or reimburse the following costs to Miclat:

- The costs of a nursing review course identified by PCS;
- The costs of initial professional licensing;
- The costs of credentialing;
- The costs of visa screens;
- The costs of the NCLEX nurse licensing examination; and
- The costs of an English-language proficiency examination.

*Id.* at 3, § 4(a).  Further, PCS agreed to provide to Miclat a plane ticket to the United States, thousands of dollars in a housing allowance, hundreds of dollars in gift cards for groceries, and a monthly pass for local public transportation. *Id.* § 4(b).  In return for these substantial benefits, which enabled Miclat both to come to the United States to work, and to become a lawful permanent resident of the United States, Miclat agreed to work for PCS for three years (or an hourly equivalent). *Id.*

Like ACS' employment agreement with Vidal, PCS' employment agreement with Miclat included an arbitration provision through which Miclat and PCS agreed to arbitrate any disputes either party may have arising out of the agreement. *Id.* at 11–12.  The employment agreement provided that if Miclat terminated her employment without Good Reason (as that term is defined in the Employment Agreement), PCS would be "entitled to all damages and other relief to redress

---

[7] The Court may consider Miclat's employment agreement for the same reason it may consider the above exhibits – it is a document upon which DOL's Amended Complaint relies and which is integral to its Amended Complaint. *See supra* note 3.

the harm caused by the failure of" Miclat to fulfill her obligations.  *Id.* at 6, § 10(a)(1).  Likewise, if PCS breached the employment contract, Miclat could seek damages against PCS in arbitration.  *Id.* at 11.  Further, the prevailing party would be entitled to reasonable attorneys' fees.  *Id.*  In evaluating any claims – including claims for damages brought by PCS against Miclat or vice versa – the arbitrator would be bound by applicable law.  *Id.* at 12.

After a few months of work, Miclat breached her employment agreement by resigning from PCS without Good Reason.  Am. Compl. ¶¶ 139, 153–54; *see also* Ex. C at 6, § 10(a)(2).  PCS commenced arbitration proceedings against Miclat, but, like in ACS' arbitration against Vidal, never sought a specific amount of damages.  *See generally* Miclat Arbitration Demand, attached as Exhibit D.[8]  At Miclat's request, and with the consent of PCS, PCS' arbitration against Miclat has been stayed pending a determination in *Vidal v. ACS*, No. 22-cv-5535-NRM-MMH (E.D.N.Y.), currently on appeal, so there have been no arbitral findings or arbitration award of any damages.  *See* AAA March 8, 2023 letter, attached as Exhibit E.[9]

DOL pled no facts concerning Miclat's total earnings from PCS.  *See generally* Am. Compl. ¶¶ 159–65.  DOL did plead that in three separate weeks – weeks ending June 25, 2022; July 23, 2022; and November 12, 2022 – Miclat worked 65.74 hours (at an hourly rate of $38/hour), 65.87 hours (at an hourly rate of $38/hour); and 51.35 hours (at an hourly rate of $38/hour), respectively.  *Id.* ¶¶ 161–63.  DOL does not allege that PCS improperly deducted or

---

[8] The Court may consider PCS' arbitration demand for the same reason it may consider the above exhibits – it is a document upon which DOL's Amended Complaint relies and which is integral to its Amended Complaint.  *See supra* note 3.

[9] The Court may consider the AAA letter confirming the stay of PCS' arbitration demand against Miclat for the same reason it may consider the above exhibits – it is a document upon which DOL's Amended Complaint relies and which is integral to its Amended Complaint.  *See supra* note 3.

withheld any amount from Miclat's wages, or that Miclat has paid PCS any amount as monetary damages or as a settlement, because she has not.

Although the Amended Complaint focuses almost exclusively on Miclat's employment relationship with PCS (and Vidal's employment relationship with ACS, as discussed above), DOL makes the same vague allegations "[o]n information and belief" as to PCS that it makes with respect to ACS – that "PCS has entered into substantially similar contracts with numerous other PCS employees," and has "claw[ed] back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA." *Id.* ¶¶ 138, 166. The Amended Complaint does not identify other PCS employees, whether those employees were subject to the 2022 employment agreement, whether those employees left PCS, what (if any) claims Defendants have asserted against those employees in letters or arbitration demands, whether their claims were arbitrated, how many hours they worked, how much they were paid, or how much they allegedly returned to PCS.

## **ARGUMENT**

### I.   **DOL Lacks Article III Standing to Bring its Claims Because it Alleges No Concrete and Particularized Harm.**

A claim must be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) where, as here, "'the district court lacks the statutory or constitutional power to adjudicate it.'" *Hoeffner v. D'Amato*, 605 F. Supp. 3d 467, 474 (E.D.N.Y. 2022) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). To survive a motion to dismiss, "[t]he Complaint's allegations 'must be enough to raise a right to relief above the speculative level.'" *In re Chembio Diagnostics, Inc. Secs. Litig.*, 586 F. Supp. 3d 199, 215 (E.D.N.Y. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Indeed, only 'a plausible claim for relief survives a motion to dismiss.'" *Id.* (quoting *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476

(2d Cir. 2009)).  "This standard demands 'more than a sheer possibility that a defendant has acted unlawfully.'"  *Isbell v. City of New York*, 316 F. Supp. 3d 571, 582 (S.D.N.Y. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

DOL's Amended Complaint fails because it does not establish that DOL has Article III standing to assert claims of hypothetical future violations of the FLSA.  *See Mendoza v. Edge*, 615 F. Supp. 3d 163 (E.D.N.Y. 2022) (dismissing claim for lack of subject matter jurisdiction under Rule 12(b)(1)).  "[T]he party asserting subject matter jurisdiction[ ] has the burden of proving that it exists by a preponderance of the evidence."  *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 443 (2d Cir. 2019) (citing *Makarova*, 201 F.3d at 113).  DOL must establish each of the three elements of constitutional standing: "(1) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  DOL fails to meet its burden.

Fatal to DOL's claims is its inability to plead that any Employer's employee suffered an injury in fact sufficient to confer standing.  *See Thole*, 140 S. Ct. at 1615 (explaining a plaintiff must show "she suffered an injury that is concrete, particularized, and actual").  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, **not conjectural or hypothetical**.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560) (emphasis added).  As the Supreme Court has explained, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Id.* at 340.  Put simply: "No concrete harm, no standing."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).  Because DOL fails to allege concrete

harm to the Individual Employees or to any employee, it lacks standing and the Amended Complaint should be dismissed.

DOL alleges that Vidal worked for ACS for 512.51 hours; received $20,372.90 in gross wages; worked 40.75 hours during one week of his employment with ACS; and that ACS filed an arbitration demand against Vidal for breach of contract.  Am. Compl. ¶¶ 101, 108–110.  DOL alleges only that Miclat worked for PCS from March 1, 2022 to approximately November 19, 2022, and that she worked several weeks of overtime during that period.  *Id.* ¶¶ 139, 154, 161–63.[10]  DOL does not allege (nor can it) that the arbitrations against the Individual Employees have proceeded, let alone that an arbitrator entered an award in favor of the Employers and against the Individual Employees.  DOL does not allege (nor can it) that the Individual Employees have paid the Employers any sum of money, much less a sum of money that would reduce their income below the FLSA-mandated minimum wage and overtime compensation requirements.

Instead, DOL hypothesizes that the Employers' arbitration demands, if successful, would bring Vidal's income below the FLSA minimum wage and overtime rates, and would bring Miclat's income below the FLSA minimum wage during her final workweek.  *Id.* ¶¶ 106–07, 160. And DOL hypothesizes that, with respect to other unnamed former Employers' employees, an arbitration and recovery against them "would bring employees' pay below the FLSA minimum" and "would bring employees' wages below the amount required" for overtime wages.  *Id.* ¶¶ 168, 171.  DOL can only allege that the Employers' employment contracts "may be" problematic.  *Id.* ¶ 1.  Even these hypotheticals are defective because they are based on an unsupported and novel legal theory regarding "kickbacks."  *See* Section III, *infra*.

---

[10] DOL's failure to allege the gross wages Miclat received from PCS further demonstrates its lack of standing to assert its claims.

The key word infecting DOL's entire amended complaint is "would." "Would" belies the fact that DOL has not alleged Defendants ***did*** bring employees' pay below the FLSA minimum wage and overtime compensation requirements. "Would" belies the fact that DOL's amended complaint teeters on hypotheticals. But "[u]nder Article III, federal courts do not adjudicate hypothetical or abstract disputes." *TransUnion*, 141 S. Ct. at 2203.

To the extent DOL suggests that the commenced arbitrations against the Individual Employees resuscitate its foundering claim, it is wrong. The currently enjoined Vidal arbitration does not pose an "imminent" risk of harm because a number of things – of which none are certain – would have to occur before Vidal would even come close to having any obligation to pay ACS a penny. ***First***, at arbitration, ACS would have to prevail on liability as to its breach of contract claim and overcome Vidal's defenses and counterclaims (including those under the FLSA or other statutes). ***Second***, ACS would have to prove damages and, again, overcome Vidal's defenses thereto. Even if ACS were to eventually secure an arbitration award (which may or may not include attorneys' fees), it is not certain that the award would result in the harm DOL hypothesizes today. Further, Vidal could still move to vacate the award before he ever had to pay ACS. Accordingly, any risk of harm to Vidal is highly attenuated and far from certain. Regarding Miclat's arbitration, at Miclat's request, PCS has stayed the arbitration against her. Even if that arbitration were to proceed, PCS would have to run the same gauntlet as ACS, and prevail at every step, before Miclat faced any "imminent" risk of Miclat owing PCS a penny. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013)). Here, because neither prerequisite is met, DOL lacks standing.

For the same reasons, DOL lacks Article III standing to pursue its request for declaratory and injunctive relief.  "A plaintiff seeking injunctive relief must . . . prove that the identified injury in fact presents a real and immediate threat of repeated injury."  *Chung v. Igloo Products Corp.*, 2022 WL 2657350, at *4 (E.D.N.Y. July 8, 2022) (cleaned up).  And the Second Circuit is clear that "[a] plaintiff pursuing injunctive relief may not rely solely on past injury, but must also establish that she is likely to be harmed again in the future in a similar way." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 7 (2d Cir. 2022) (cleaned up).  "Such threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Id.* (cleaned up).

Besides a vague, unsupported allegation that Employers have similar contracts with other employees, DOL pleads no facts suggesting other employees face the same (nonexistent) harm as did the Individual Employees.  Am. Compl. ¶¶ 86, 138.  Tellingly, DOL does not allege the Employers have continued or will continue to enforce these contracts.  DOL merely alleges the Employers have entered substantially similar contracts with employees, and that, on information and belief, the Employers have *in the past* recovered amounts under those contracts.  *Id.* ¶¶ 113, 166.  That is precisely the type of **retrospective** alleged harm that is insufficient to support **prospective** injunctive relief.  Because DOL alleges no "real an immediate threat of repeated injury," it has failed to allege the type of harm that would confer on its Article III standing, and its request for declaratory and injunctive relief must be dismissed.  *Chung*, 2022 WL 2657350, at *4

DOL has not, and cannot, establish injury in fact, either to the Individual Employees or to any other former Employers' employee.  Accordingly, DOL lacks standing to pursue its claims, and the Amended Complaint should be dismissed.

II.   **DOL's Amended Complaint Fails to State a Plausible Claim for Violating the FLSA Because DOL Has Not Alleged That Any Employee Actually Received Less Than the Minimum Wage or Overtime Wage.**

For the same reasons DOL lacks Article III standing, DOL's Amended Complaint fails to state a claim for FLSA violations.  "With certain exceptions not relevant here, the FLSA requires employers to pay all employees a specified minimum wage, and overtime of time and one-half for hours worked in excess of forty hours per week."  *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 533 (2d Cir. 2016) (citing 29 U.S.C. §§ 206–07).  Because DOL does not allege that Defendants paid their employees less than the minimum wage or the overtime wages to which they are entitled, its Amended Complaint should be dismissed.

DOL has failed to meet the basic FLSA pleading standards.  "[T]o state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."  *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (concluding plaintiff failed to plead FLSA overtime violation "because Plaintiffs have not alleged a single workweek in which they worked at least 40 hours and also worked uncompensated time in excess of 40 hours.").

Similarly, a plaintiff's burden in pleading an FLSA minimum wage claim "is arithmetical." *Lopez-Serrano v. Rockmore*, 132 F. Supp. 3d 390, 402 (E.D.N.Y. 2015).  "An employee cannot state a claim for a minimum wage violation unless his average hourly wage falls below the federal minimum wage."  *Id.* (cleaned up).  A plaintiff must "allege facts about her salary and working hours, such that a simple arithmetical calculation can be used to determine the amount owed per pay period."  *Id.* (quoting *Serrano v. I. Hardware Distribs., Inc.*, No. 14-CV-2488 PAC, 2015 WL 4528170, at *3 (S.D.N.Y. July 27, 2015)).  To the extent a plaintiff merely pleads that any given workweek is typical of her entire period of employment, that "assertion is conclusory and insufficient to state a claim under the FLSA."  *Id.*

14

Ignoring its obligation to allege facts about the salary paid to the Individual Employees "such that a simple arithmetical calculation can be used to determine the amount owed per pay period," *Lopez-Serrano*, 132 F. Supp. 3d at 402, DOL instead suggests that one former ACS employee's wages may fall below the minimum wage floor based on a possible future event: the hypothetical award by an arbitrator of an amount of damages that could – if viewed as a kickback or deduction from wages – constitute an FLSA violation.

According to DOL, merely by making an arbitration demand – a demand in which ACS has sought no specific monetary damages – ACS has failed to pay its employees more than the minimum wage.  *See* Am. Compl. ¶¶ 106–07.  This makes no sense.  ACS clearly explained to Vidal that its "damages would ultimately be determined by an arbitrator pursuant to the Agreement."  Ex. B at 1.  And this presumes ACS would succeed in its arbitration *and* that the arbitrator would award not only some amount of damages to ACS, but such an amount to bring Vidal's wages below the FLSA floor.  Even assuming the DOL's contention that a contractual damages award could constitute a kickback – which is wrong as a matter of law (*see* Section III) – none of these events have occurred.  Indeed, such events may never occur.  Accordingly, unless and until they do, Vidal's wages have not been reduced.  Although DOL pleads the first half of the arithmetic equation (the wages ACS paid Vidal), it does not plead the second half (a reduction in those wages).  Am. Compl. ¶¶ 105–09.  DOL did not plead Vidal's lost wages because Vidal has not lost any wages.

Likewise, although DOL points to a single week in which Vidal worked 40.75 hours, DOL does not plead that ACS failed to pay Vidal the required overtime compensation for the 45 minutes of overtime he worked that week.  *Id.* ¶ 110.  The same is true of DOL's allegations concerning Miclat and PCS.  To be sure, DOL points to three weeks in which Miclat worked overtime hours,

15

for which PCS paid her $38/hour.  *Id.* ¶¶ 161–63.  Absent is any suggestion that PCS failed to pay Miclat for the overtime hours she worked.  These allegations are deficient and do not raise DOL's right to relief above a speculative level for the only named Employers' employees.

DOL's request for relief is similarly fundamentally flawed.  DOL alleges Defendants are liable to their employees for unpaid minimum wages and overtime compensation.  *See id.* ¶¶ 169, 172.  But nowhere does it plead who those employees are, how many hours they worked, how much the Employers paid those employees, how much the Employers recovered from those employees under its contracts, and what the resulting net wages are to the Employers' employees. As discussed above, DOL fails to allege that the Individual Employees – or any other present or former Employers' employee – has suffered any harm.

DOL has tried, and failed, to use this same deficient litigating strategy before.  *See Walsh v. Lalaja, Inc.*, 565 F. Supp. 3d 766 (E.D.N.C. 2021).  In *Lalaja*, DOL sued a restaurant for allegedly failing to pay minimum wage and overtime to at least ten named employees.  *See id.* at 769.  There, unlike here, DOL actually named the employees to whom back wages were allegedly owed.  *Id.*  And there, like here, DOL pled no facts about the number of hours each employee worked, how much the defendant paid them, and whether that amount fell below the FLSA minimum wage and overtime requirements.  *Id.* at 772.  The district court explained that "[f]or the minimum wage claim . . . [DOL] alleges that defendant failed 'to pay employees, including servers, cooks, and other staff . . . the applicable minimum hourly rate.'"  *Id.*  Similarly, "[f]or the overtime claim, [DOL] alleges defendant failed to pay the same employees at the applicable overtime rate." *Id.*

The district court properly concluded these allegations were insufficient to plead FLSA violations. It explained that "there is an absence of any estimate of the length of employees' average workweek during the applicable period and the average rate at which they were paid, the amount of overtime wages they believe they are owed, or any other facts that will permit the court to find plausibility." *Id.* (cleaned up). Granting the defendant's motion for judgment on the pleadings, the district court explained that "[m]ore factual allegations are needed to state a plausible claim for such violations." *Id.* The district court properly refused to "speculate as to the factual basis for [DOL's] wage" claims. *Id.* at 773.

Like in *Lalaja*, courts routinely dismiss FLSA claims where employee-plaintiffs fail to allege their wages fell below the FLSA-required minimum wage. *See, e.g.*, *Marcial v. New Hudson Fam. Rest. Inc.*, No. 7:18-CV-0663 (NSR)(JCM), 2019 WL 1900336, at *6 (S.D.N.Y. Apr. 29, 2019) (dismissing FLSA minimum wage claim where plaintiff's wages exceeded the minimum weekly wage because plaintiff did not allege an injury); *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962, 978–81 (N.D. Ill. 2019) (dismissing FLSA minimum wage and overtime claims because plaintiffs failed to provide "details about what they were or were not paid, and at least one example of a pay period in which their pay was insufficient given the number of hours they worked."); *Heuberger v. Smith*, No. 3:16-CV-386-JD-JEM, 2017 WL 3923271, at *9–10 (N.D. Ind. Sept. 7, 2017) (dismissing FLSA minimum wage claim where paystubs confirmed "*no* deductions . . . were ever subtracted from Plaintiff's wages.").

Here, DOL is asking the Court to speculate as to the factual basis for its FLSA claims. DOL failed to allege for any employees – even the Individual Employees – the length of average workweeks, the average rate at which they were paid, the amount of overtime wages they are owed, or any other facts that can permit this Court to find an actionable violation of the FLSA. DOL's

pleading is limited to the Individual Employees' earnings, earnings which, by DOL's own pleadings, have not been reduced below the FLSA floor. Those numbers, without more, do not show that Defendants violated the FLSA.

Because DOL fails to plead that the Individual Employees (or any other current or former Employers' employee) did not receive the FLSA-mandated minimum wage and overtime compensation, it has failed to state a claim for relief and its Amended Complaint must be dismissed.

## III.   Potential Damages for Breach of Contract Are Not "Kickbacks" of Earned Wages.

DOL's Amended Complaint should also be dismissed for the independent reason that its legal theory that the Employers' employment contracts prevent their employees from receiving their wages free and clear is wrong as a matter of law. The FLSA requires that "a minimum wage must be paid free and clear of any deductions or kickbacks to the employer." *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 299 (E.D.N.Y. 2013) (cleaned up). The FLSA's implementing regulations explain that:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35. Consistent with the regulation, "[c]ourts have generally found deductions for 'tools of the trade' such as uniforms, vehicles and other costs that are specific business expenses of the employer, and that are primarily for the benefit of the employer, to be 'kickbacks.'" *Park v. FDM Grp. (Hldgs.) PLC*, 16-CV-1520-LTS, 2017 WL 946298, at *3 (S.D.N.Y. Mar. 9, 2017),

18

*vacated in part on other grounds by Park v. FDM Grp., Inc.*, 16-CV-1520-LTS, 2018 WL 4100524 (S.D.N.Y. Aug. 29, 2018) (granting motion for reconsideration to permit plaintiff leave to file a Second Amended Complaint).

Courts in this circuit have rejected the DOL's "kickback" theory even where, unlike here, an employer imposed **liquidated damages** on an employee for their early termination of employment. For example, in *Park*, the plaintiff signed a two-year employment agreement with a liquidated damages provision. 2017 WL 946298, at *2. If she quit in the first year, the plaintiff was required to pay a $30,000 termination fee; if she quit in the second year, she was required to pay a $20,000 termination fee. *Id.* The plaintiff quit after one year and paid the $20,000 termination fee. *Id.* After quitting, the plaintiff sued the employer, alleging the $20,000 termination fee was an illegal kickback and that she had not received her wages free and clear. *See id.* at *3.

The United States District Court for the Southern District of New York disagreed with the plaintiff, concluding that such a provision "is not a deduction for tools used or costs incurred in the course of Plaintiff's performance of her job . . . ." *Id.* at *4. The court noted that if the plaintiff completed her two-year employment obligation, she would owe her employer nothing, and that "[s]uch liquidated damages provisions in employment agreements are not unusual . . . ." *Id.* There, the plaintiff did "not allege that she was subjected to any deductions from her paychecks" for the termination fee. *Id.* Because the plaintiff did not allege any deductions or withholdings, and because the $20,000 liquidated damages provision for early departure did not constitute an FLSA kickback, the court dismissed her FLSA minimum wage claim. *Id.* Other courts have approved of the legal reasoning in *Park*. *See, e.g.*, *Bland v. Edward D. Jones & Co., L.P.*, No. 18-CV-1832, 2020 WL 1503574, at *6 (N.D. Ill. Mar. 30, 2020) (citing *Park* favorably and noting that

"liquidated damages imposed following the termination of employment are not kickbacks under the FLSA.").

Courts have similarly concluded that requiring a former employee to reimburse training expenses if they quit before a set period of time does not violate the FLSA. *See Gordon v. City of Oakland*, 627 F.3d 1092 (9th Cir. 2010) (upholding repayment of training debt for policy training when officer left before five-year time period specifying loan forgiveness); *Heder v. City of Two Rivers, Wis.*, 295 F.3d 777 (7th Cir. 2002) (upholding requirement that an employee firefighter who left job before completing three years of service repay costs of training); *Milford v. Roehl Transp., Inc.*, 22-CV-0879-BHL, 2023 WL 2503495, at *4–5 (E.D. Wis. Mar. 14, 2023) (applying *Heder*, *Gordon*, and *Bland*, and granting employer's motion to dismiss FLSA minimum wage claim for post-employment collections of training expenses).

Although two cases from district courts in other jurisdictions that involve employees repaying significant costs associated with their training have permitted FLSA minimum wage claims to proceed past the motion-to-dismiss stage, both are far afield of the factual and legal issues here and the Court should not extend their limited and inapposite reasoning to this case. *See Ketner v. Branch Banking & Trust Co.,* 143 F. Supp. 3d 370 (M.D.N.C. 2015); *McClain v. Cape Air*, 22-CV-10649-DJC, 2023 WL 3587284 (D. Mass. May 22, 2023). Critically, in both *Ketner* and *McClain*, the district courts did not question the commonsense proposition that employers may require their employees to repay the actual value of a benefit conferred. Rather, both courts focused on the harm in requiring employees to repay amounts that far exceed the value of the benefit conferred on the employees. But here, the Individual Employees' arbitration agreements and the Employers' demands require payment only of the actual amount of damages incurred, as

*determined by an arbitrator following an evidentiary hearing and in accordance with applicable law*.  Accordingly, neither *Ketner* nor *McClain* apply here.

In *Ketner*, the employer required, as a condition of employment, that its new employees participate in an in-house leadership training program and sign a training cost agreement (TCA). *Id.* at 375.  The TCA required employees to repay the training costs associated with the program if they resigned or were fired for cause within five years of their first day of work.  *Id.*  The employer valued its training program at $46,000, and the TCA provided that 1/60th of the $46,000 would be forgiven for every month the employee worked.  *Id.*  The $46,000 valuation was simply announced by the employer, and because it was an internal corporate training, there was no external valuation.

After completing the program, the plaintiffs resigned before the five-year commitment concluded, and the employer sought to recover the balances the plaintiffs owed under the TCA. *Id.* at 375–76.  To that end, the employer's counsel sent a letter to plaintiffs demanding they pay a sum certain: $35,982.92 from one plaintiff and $27,600.00 from the other.  *Id.* at 376.  The employer's counsel explained that if they refused to repay the sum certain amounts, the employer would take legal action to recover the balance.  *Id.*  Neither plaintiff repaid the employer and instead alleged FLSA violations.  *Id.*  The plaintiff[11] alleged enforcement of the TCA violated the FLSA "because it has the effect of requiring employees to work for wages lower than minimum wage and further that their wages were not paid 'free and clear' as required by the Act."  *Id.* at 382.

---

[11] Only one of the two plaintiffs could assert the FLSA minimum wage claims because the other plaintiff "earned $100,000 and repayment of the training costs as required by the TCA would not cause his salary to fall below the minimum wage."  *Ketner*, 143 F. Supp. 3d at 382 n.6.

The district court concluded the plaintiff plausibly stated an FLSA claim. *Id.* at 383–84. It noted that, "unlike in *Heder* and *Gordon*, where the plaintiffs received a certification recognized beyond their former employers, Ketner challenges BB & T's training program as not conferring to him any benefit that is recognized within the broader marketplace or to him as an associate." *Id.* Accordingly, the district court concluded the plaintiff "has alleged a plausible claim that the $35,982.92 BB & T seeks to collect from him constitutes a kick-back of the $46,000 BB & T paid to him and, thus, would violate FLSA's minimum wage requirement." *Id.* at 384.

In *McClain*, the plaintiffs were pilots seeking a commercial pilot certification required for commercial air flights. 2023 WL 3587284, at *2. The employment agreements plaintiffs signed with their employer promised that the plaintiffs would receive sufficient experience to earn their certificate and qualify as commercial pilots, and required each plaintiff to work for the employer for a minimum period after obtaining certification, ranging from 12 to 18 months. *Id.* Any pilot who resigned or was terminated for cause before completing the minimum employment period had to repay "the reasonable costs and training investment in [their] training" which the plaintiffs "acknowledged to be thirty thousand dollars." *Id.* After resigning early, the employer demanded that the plaintiffs pay the $30,000 training investment. *Id.* at *3.

In asserting FLSA claims against the employer, the plaintiffs alleged "that repayment of $30,000 in supposed training costs amounts to an unlawful kickback that would cause Plaintiffs' wages to fall below the federal . . . minimum wage." *Id.* at *5. The district court explained that "[d]istrict courts following Gordon and Heder have dismissed minimum wage kickback claims based upon contracts requiring repayment of training costs for portable licenses and certifications, provided the employer does not deduct the amount owed from an employee's paycheck." *Id.* at *6. It noted that *Ketner* was one court that had reached the opposite result. *Id.*

22

The district court denied the employer's motion to dismiss, but based its decision on the fact that the plaintiffs "allege[d] that the purported $30,000 training investment is unmoored from the actual cost of [pilot] training, which is less than $10,000. The plausibility of Plaintiffs' position is bolstered by the fact that Cape Air seeks the same $30,000 regardless of whether the pilot in question needed hundreds of hours of flight time . . . or no flight time." *Id.* The court's narrow reasoning was simply that it was "not persuaded that Heder and its progeny stand for the proposition that all kickback claims involving a training repayment provision fail to state a plausible claim." *Id.* at *7. Accordingly, it permitted the FLSA claim to proceed to discovery. *Id.*

The facts and claims in *Ketner* and *McClain* are distinguishable for at least **three** reasons. ***First***, unlike in *Ketner* and *McClain*, where the employer sought a sum certain ($35,982.92 in *Ketner* and $30,000 in *McClain*), here the Employers have not demanded the Individual Employees pay any specific amount. In ACS' June 22, 2022, letter to Vidal, ACS explained that if Vidal *did* decide to resign, ACS "will present evidence demonstrating that its damages are at least $20,000" and that ACS "would seek thousands of dollars of lost investment made in helping you get to this point." Ex. B at 1. Likewise, in ACS' arbitration demand, ACS did not demand any specific damages. Rather, it sought an award of "all available damages." *See* Vidal Arbitration Demand, attached as Exhibit F.[12] Similarly, PCS did not demand any specific amount from Miclat. Rather, it sought an award of "all available damages." Ex. D at 7. The decision regarding what particular damages could be awarded, and the amount of such damages, if any, would be made by an arbitrator in accordance with applicable law, and not by either of the Employers.

---

[12] The Court may properly consider the Vidal Arbitration Demand at the motion-to-dismiss stage. *See supra* note 3.

As discussed above, the Individual Employees have not been asked (or ordered) to pay the Employers any specific amount of money. Therefore, unlike in *Ketner* and *McClain*, where the district courts could evaluate the sum certain against the amount the plaintiff earned while working for the employer, here, no such calculation is possible.

**Second**, both *Ketner* and *McClain* concern employers attempting to recoup loans related to training expenses, rather than for pure breach of contract. In *Ketner*, that training was an in-house training, and in *McClain* it was an industry-standard training. By contrast, the Employers' arbitration demands concerns pure breach of contract. If, for example, the Employers had required the Individual Employees to attend a six-month nurse-training program at a cost of $15,000, and then sought to recoup that $15,000 after the Individual Employees quit, then *Ketner* and *McClain* may be more relevant. But neither *Ketner* nor *McClain* support DOL's unprecedented theory that a breach-of-contract claim, standing alone, constitutes a kickback under the FLSA. *See also* Jonathan F. Harris, *Unconscionability in Contracting for Worker Training*, 72 ALA. L. REV. 723, 742–45 (2021) (analyzing the reasoning in *Heder* (which the author described as "seminal"), *Gordon*, *Ketner*, *Bland*, and *Park*, and concluding that the "typical reading" of the FLSA "demonstrates how the FLSA anti-kickback provision is not suited for many challenges to TRAs."); Stuart Lichten & Eric M. Fink, *"Just When I Thought I Was Out . . . .": Post-Employment Repayment Obligations*, 25 WASH. & LEE J. CIVIL RTS. & SOC. JUST. 51, 71 (2018) (explaining that the plaintiff in *Park* was "trying to force the FLSA peg into the post-employment obligation hole"). The Court should decline to drastically expand the limited reasoning from *Ketner* and *McClain* to post-employment breach-of-contract actions.

*Third*, the Individual Employees received an immensely valuable benefit from their employment with the Employers: lawful permanent resident status in the United States.  Lawful permanent residents "are lawfully authorized to live permanently within the United States.  [They] may accept an offer of employment without special restrictions, own property, receive financial assistance at public colleges and universities, and join the Armed Forces.  They may also apply to become U.S. citizens if they meet certain eligibility requirements."  U.S. DEP'T OF HOMELAND SECURITY, *Lawful Permanent Residents (LPR)*, (Feb. 13, 2023), https://bit.ly/3CffWXC.  *See also* Pamela Kemp Parker, *Meeting the Citizenship and Immigration Needs of Foster Children*, 31 NO. 11 CHILD L. PRAC. 129, 134 (2012) ("A lawful permanent resident (LPR) can work legally, qualify for some government benefits and, barring commission of a serious criminal offense, cannot be removed (deported) from the U.S."); *Route v. Garland*, 996 F.3d 968, 981 (9th Cir. 2021) (explaining "Congress's well-established policy of affording aliens with legal permanent resident status more benefits than non-permanent residents under the INA.") (cleaned up); *Moore v. Ashcroft*, 251 F.3d 919, 925 (11th Cir. 2001) ("[L]awful permanent resident[s] . . . enjoy substantial rights and privileges not shared by" other categories of migrants); *Nwolise v. U.S. I.N.S.*, 4 F.3d 306, 311 (4th Cir. 1993) (noting the "significant benefits attendant to lawful permanent resident status").

The Individual Employees' receipt of LPR status is a significant personal benefit.  It is not an "internal" benefit like the corporate training in *Ketner*, and it is not even a portable credential like the benefits in *McClain*, *Heder*, and *Gordon*.  Rather, it is a fundamentally life-changing benefit that inures tremendously to the Individual Employees.  Once the Individual Employees concluded their three years working for the Employers (or the hourly equivalent), they could live and work in the United States and apply for U.S. citizenship.  This is a unique benefit far beyond

that obtained by the plaintiffs in *Ketner* or even *McClain* and makes any parallel between this case and those decisions particularly inapposite.

*     *     *

If, as discussed above, employers' recoupment of training costs and similar expenses is not ordinarily a kickback, then DOL's theory that merely requiring an employee to submit to arbitration – a process that courts routinely recognize is valid in the FLSA context – to determine whether the employee (or employer) even owes the other party anything necessarily cannot be a kickback either.  DOL's spurious theory – that a contract with an arbitration provision that could subject an individual to damages for breach is a kickback under the FLSA – is wrong as a matter of law and would lead to absurd results.  The Individual Employees' employment agreements required them to arbitrate, without limitation, "claims involving an alleged violation of public policy; all statutory claims for discrimination and/or harassment and/or retaliation under federal, state, or local law; and claims concerning wages or other compensation, whether based on statute or any other grounds."  Ex. A at 12; Ex. C at 10.  Such arbitration provisions are routinely upheld by courts in the Second Circuit.  *See, e.g.*, *Deng v. Frequency Electronics, Inc.* No. 21-CV-6081 (BMC), 2022 WL 16923999 (E.D.N.Y. Nov. 14, 2022) (granting staffing company's motion to compel arbitration of former employee's FLSA claims); *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374 (S.D.N.Y. 2021) (granting employer's motion to compel arbitration of former employees' Title VII claims); *LeDeatte v. Horizon Media*, 571 F. Supp. 3d 72 (S.D.N.Y. 2021) (granting employer's motion to compel arbitration of former employee's Title VII and ADA claims).  The Employers' arbitrations against the Individual Employees were based on the Individual Employees' express breach of the employment agreements they voluntarily signed; it is nothing more than a breach-of-contract claim for which damages may properly be assessed.

26

Moreover, any claim the Individual Employees might assert alleging Defendants violated the FLSA may also properly be compelled to arbitration. *See, e.g.*, *Deng*, 2022 WL 16923999, at *3 ("[t]he law is clear that FLSA claims are subject to arbitration") (citing *Rodriguez-Depena v. Parts Auth., Inc.*, 877 F.3d 122, 123–24 (2d Cir. 2017)). And as the Supreme Court reiterated just last term, "[a]n arbitration agreement . . . does not alter or abridge substantive rights; it merely changes how those rights will be processed." *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919 (2022). The Employers, the Individual Employees, and all of Employers' employees can fully exercise their rights and pursue their claims, but they must do so in arbitration.[13]

That the Individual Employees breached their contract by quitting after a few months is irrelevant. For example, had the Individual Employees failed to register for and take all examinations required to obtain the necessary authorizations and licenses to be a nurse, that would have constituted a breach of the employment agreement for which the Employers could have demanded recompense. *See* Ex. A at 2; Ex. C at 2. Likewise, had the Individual Employees stolen from Employers or intentionally destroyed Employers' property, that would have constituted a "dispute, controversy or claim arising between [the Individual Employees] and [the Employers]." Ex. A at 12; Ex. C at 10. And presumably, DOL would have no issue with the Individual Employees bringing claims against the Employers in arbitration for any purported breach of contract committed by the Employers and recovering any damages the Individual Employees could prove as a result of that arbitration.

---

[13] Although certain employment-related claims are not subject to mandatory arbitration as a result of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, those exceptions are irrelevant here.

By DOL's reasoning, any employment agreement with an arbitration provision would violate the FLSA and constitute an illegal kickback if the employee might have to pay contractual damages to the non-breaching employer.  Although DOL emphasizes the three-year work obligation, its legal theory is not limited to such a circumstance.  Rather, so long as an employee is bound by an arbitration agreement with their employer, DOL's theory would suggest that the mere threat of damages awarded in arbitration – even if, in fact, there has been no arbitration commenced or no award of damages made – constitutes an illegal kickback.  Both that theory and the underlying notion on which it is premised (*i.e.*, that a contractual award of damages for breach of a contract is equivalent to a kickback of earned wages) are meritless.

*    *    *

Turning to the relevant caselaw, *Park* and its progeny reject outright DOL's theory that there is no legal difference between deducting a sum from an employee's paycheck and demanding that the employee surrender a sum after being paid, pursuant to contract.  In each of those cases, like here, the employer *did not deduct or withhold any pay* from its employees.  Employees are entitled to earn their wages free and clear, but that does not give them *carte blanche* to breach their contractual obligations, particularly as it relates to receiving substantial benefits with external value.  Rather, when an employee (like any other party to a contract) breaches a contract, they owe the employer (or non-breaching party) damages under the contract's terms, a remedy for which the parties expressly bargained when they signed the agreement.  Those obligations, whether characterized as liquidated damages, repayment obligations, or (as here) potential contract damages, do *not* constitute kickbacks under the FLSA or its implementing regulation.

28

Because the Individual Employees earned their wages free and clear, those wages cannot be subject to any kickback.  Instead, the Individual Employees' breach of contract permitted the Employers to pursue damages (to be determined by an arbitrator if the Employers prevailed on their claims) separate and apart from the wages they received.  Any other result would immunize employees from any claim by their employer (even if, as discussed above, that claim may sound in tort or other common law) because the employee could simply plead that any damages the employer suffered would bring their wages below the FLSA.  That is starkly different from the types of kickbacks DOL itself has identified in the FLSA's implementing regulations.  *See* 29 C.F.R. § 531.35.  The Court should not immunize employees in a manner that would permit them to flagrantly breach valid employment contracts by shielding them from damages on an ongoing basis.  Rather, the Court should dismiss DOL's Amended Complaint because DOL failed to show a potential of future recovery for the Individual Employees' alleged breach of contract constituted an FLSA-prohibited kickback.

## **CONCLUSION**

For the reasons stated above, DOL has failed to adequately allege Article III standing and has failed as a matter of law to plead that the Defendants violated the FLSA.  Accordingly, Defendants respectfully request the Court dismiss DOL's Amended Complaint with prejudice.


Dated: New York, New York
       August 24, 2023

DECHERT LLP

By: */s/ David N. Kelley*

    David N. Kelley
    Nicolle L. Jacoby
    Tanya K. Warnke
    Three Bryant Park
    1095 Avenue of the Americas
    New York, NY 10036-6797
    david.kelley@dechert.com
    nicolle.jacoby@dechert.com
    tanya.warnke@dechert.com
    Telephone:   (212) 698-3500
    Facsimile:    (212) 698-3599

    Christopher J. Merken
    Cira Centre
    2929 Arch Street
    Philadelphia, PA 19104-2808
    christopher.merken@dechert.com
    Telephone:   (215) 994-4000
    Facsimile:    (215) 994-2222

    ***Attorneys for Defendants Advanced Care
    Staffing, LLC, Priority Care Staffing, LLC
    and Samuel Klein***