UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JULIE A. SU,
Acting Secretary of Labor, Department of
Labor,

              Plaintiff,

       v.

ADVANCED CARE STAFFING, LLC,
PRIORITY CARE STAFFING, LLC, and
SAM KLEIN, an individual,

           Defendants.

23-cv-2119 (NRM) (MMH)

**MEMORANDUM AND ORDER**

NINA R. MORRISON, United States District Judge:

      Plaintiff Julie A. Su, Acting Secretary of Labor ("Department of Labor" or
"DOL") brings this suit against Advanced Care Staffing, LLC ("ACS"), Priority Care
Staffing, LLC ("PCS"), and the CEO of both ACS and PCS (and owner of PCS), Samuel
Klein (collectively "Defendants"). *See* Am. Compl. at ¶¶ 15–46, ECF No. 19. ACS and
PCS are staffing agencies that recruit healthcare workers, sometimes from abroad,
to work at medical facilities. *Id.* at ¶¶ 47, 56, 65. DOL alleges that Defendants
require employees to sign contracts that require a three-year work commitment. *Id.*
at ¶ 1. If employees leave their employment before the term expires, the contracts
entitle Defendants to recover, among other things, "loss of anticipated profits" from
employees. *Id.* at ¶¶ 79, 131. DOL contends that this provision violates the Fair
Labor Standards Act ("FLSA") by converting employees' wages "into nothing more

than a loan that employees must repay with interest and fees, leaving some employees with no compensation at all, much less the wages required by the FLSA." *Id.* at ¶ 1.

Defendants move to dismiss on three grounds: (1) DOL lacks standing because the employees whose interests it seeks to vindicate in this litigation have not suffered any injury; (2) DOL fails to state a plausible claim because it does not allege that any employee has received less than the minimum wage or overtime wage the FLSA requires; and (3) DOL fails to state a plausible claim because potential breach of contract damages do not constitute "kick-backs" of earned wages under the FLSA. Mem. of L. in Supp. of Mot. to Dismiss ("Opening Br."), ECF No. 28-1. For the reasons to follow, the Court denies Defendants' motion to dismiss.

## BACKGROUND

### I.     Complaint

On March 20, 2023, DOL commenced the instant action against ACS and Sam Klein. Compl., ECF No. 1. DOL filed an amended complaint on July 20, 2023, which added claims against PCS. *See* Am. Compl. DOL's amended complaint (hereinafter "Complaint") alleges the following facts.[1]

---

[1] Defendants submitted various exhibits in support of their motion to dismiss, including Vidal's and Miclat's employment agreements, emails between Defendants and Vidal, and the arbitration demands against Vidal and Miclat. Because courts can consider documents that a plaintiff relies on in drafting the complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), and the parties agree that these documents were "relied on in the Complaint," Mem. of L. in Opp'n to Mot. to Dismiss ("Opp'n Br.") at 16 n.11, ECF No. 29, the Court considers Defendants' exhibits. Accordingly, where relevant, the Court incorporates facts drawn from the exhibits to Defendants' motion to dismiss in its summary of the allegations in DOL's Complaint.

ACS and PCS (collectively, the "Staffing Companies") are staffing agencies that recruit and place healthcare workers in positions at medical facilities. Am. Compl. at ¶¶ 47, 56. The companies share management, follow the same hiring practices, and use identical contracts. *Id.* at ¶ 64. They also use the same international department that recruits nurses from the Philippines and elsewhere to work for the companies. *Id.* at ¶ 65.

As relevant here, the Complaint includes the following allegations as to the Staffing Companies' contracts and employment practices, which the Court accepts as true for purposes of deciding Defendants' motions to dismiss.

### A.    Allegations as to ACS

In or around 2019, ACS began recruiting Benzor Vidal from the Philippines to work as a registered nurse in the United States. *Id.* at ¶¶ 71, 77. Before Vidal moved to the United States, he signed a contract with ACS. Vidal first signed a contract that contained a $20,000 liquidated damages clause in the event he stopped working for ACS prior to a three-year contract term. *Id.* at ¶ 73. In 2022, shortly before moving to the United States to work for ACS, Vidal signed a new contract, which superseded the earlier contract. *Id.* at ¶¶ 72–73. According to Klein, who sent Vidal the contract, the 2022 contract "allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version)." *Id.* at ¶ 76.

The 2022 contract includes provisions stating that ACS will prepare, submit, and pay for an employment-based immigrant visa petition for Vidal, ACS Contract at

3

3, ECF No. 28-2, and advance Vidal certain costs relating to relocating and working as a nurse, *id.* at 4. However, the contract states that if Vidal fails to complete a three-year term of employment without "Good Reason," ACS intends to recover expenses relating to the visa petition and advanced costs, as well as "loss of profits (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact on Employer's relationship with its Clients)." *Id.* at 7. The contract defines "Good Reason" as "a failure by Employer to correct a material breach" of the contract provisions requiring ACS to pursue an employment-based visa and pay wages within 35 days of receiving written notice of such breach. *Id.* The contract further states that nearly any dispute between ACS and Vidal "shall be resolved by arbitration" administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules. *Id.* at 12. The contract entitles the prevailing party in the arbitration to "reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator," *id.*, and requires Vidal to "reimburse [ACS] for all reasonable costs, including all attorneys' fees that Employer incurs in enforcing its rights and remedies," *id.* at 8.

Vidal signed the contract and began working at Downtown Brooklyn Nursing and Rehabilitation Center ("DBNRC") on or about March 8, 2022. Am. Compl. at ¶ 87. During his tenure at DBNRC, Vidal raised concerns about the working conditions at the facility to both ACS and DBNRC. *Id.* at ¶ 89. "[F]aced with a good-faith belief that he could not continue to work under" those conditions, Vidal then notified ACS on June 15, 2022, that he was resigning, effective June 29, 2022. *Id.* at ¶ 91. Vidal's

4

resignation letter "reiterated his serious safety concerns associated with the working conditions" and cited physical and mental health effects he attributes to those conditions. *Id.* at ¶ 92.

ACS sent Vidal a letter on June 22, 2022, demanding that Vidal continue to work and threatening that if he stopped working, ACS would initiate an arbitration, begin to incur arbitration costs and attorneys' fees which it would then seek to recover, and seek over $9,000 in future profits per year through the remainder of Vidal's three-year term (which DOL estimates would amount to over $24,000). Am. Compl. at ¶¶ 95–99; Letter dated June 22, 2022 ("June 22 Letter"), ECF No. 28-3. The $24,000 amount alone is equal to, if not more than, the amount Vidal earned during his entire period of employment with ACS. Am. Compl. at ¶ 99.

Then, on July 8, 2022, ACS filed an arbitration demand against Vidal, which demanded "all available damages, including, without limitation, [ACS's] Advanced Costs and lost profits; reasonable attorneys' fees; cost of arbitration;" and "interest in accordance with New York Law." Vidal Arbitration Demand at 7, ECF No. 28-7. In terms of the arbitration costs, ACS incurred a $1,900 filing fee and a $750 case management fee in connection with the arbitration against Vidal, and the hourly rate of the appointed arbitrator was stated to be $450/hour. Am. Compl. at ¶¶ 103–04.

On the week ending April 9, 2022, Vidal worked overtime and was paid $1,480.50 in gross wages for 40.75 hours. *Id.* at ¶ 110. During his last week of work, Vidal earned $839.04 in gross wages for 22.08 hours. *Id.* at ¶ 105. Vidal was paid $20,372.90 in gross wages for the 512.51 total hours he worked at ACS. *Id.* at ¶¶

108–09. If ACS's future profits, attorneys' fees, arbitration costs, and interest were deducted from those earnings, his net wages would be below the FLSA minimum wage rate for his final week of work, and below the FLSA minimum wage and required overtime rate for his entire period of employment. *Id.* at ¶¶ 106–07.

According to the Complaint, "ACS and Klein have a policy and practice of entering into contracts with employees with identical or substantially similar contract provisions to the 2022 contract with Vidal," and, "[o]n information and belief, ACS has followed through on those contracts by clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by FLSA." *Id.* at ¶¶ 112–13.

## B.   Allegations as to PCS

The Staffing Companies recruited Cherry Lyn Miclat from the Philippines to work as a registered nurse in the United States. *Id.* at ¶ 115. Like Vidal, Miclat first signed a contract with ACS in 2019 that included a $20,000 liquidated damages clause. *Id.* at ¶ 118. In 2021, Klein sent Miclat a new contract on behalf of PCS with virtually identical terms to the 2022 contract that Vidal signed with ACS. *Id.* at ¶¶ 122–36. Klein told Miclat, like he told Vidal, that the new contract "allows for recovery of whatever damages are proven (which might be higher or lower than the amount specified in the older version)." *Id.* at ¶ 128.

Miclat began to work for PCS at Morningside Nursing and Rehabilitation Center ("MNRC") on March 1, 2022, where she quickly received an enormous workload without sufficient help or training. *Id.* at ¶ 139. Miclat repeatedly

6

complained about the unsafe and unreasonable conditions at MNRC to PCS and MNRC staff and unsuccessfully requested to be transferred to other facilities.  *Id.* at ¶¶ 141–50.  Eventually, based on these concerns, she resigned on October 27, 2022. *Id.* at ¶¶ 151–53.  Miclat last worked for PCS on November 19, 2022.  *Id.* at ¶ 154.

PCS filed an arbitration demand against Miclat on December 5, 2022, demanding "all available damages, including, without limitation, [PCS's] Advanced Costs and lost profits; reasonable attorneys' fees; cost of arbitration" and "interest in accordance with New York Law."  Miclat Arbitration Demand at 8, ECF No. 28-5.  As part of those arbitration costs, PCS incurred a $2,200 filing fee in connection with the arbitration and, if the arbitration proceeds, will incur a $750 case management fee.  Am. Compl. at ¶ 157.

On the weeks ending June 25, 2022, July 23, 2022, and November 12, 2022, Miclat worked overtime.  *Id.* at ¶¶ 161–63.  In those weeks, she earned $2,987.18 in gross wages for 65.74 hours, $2,994.59 in gross wages for 65.87 hours, and $2,166.95 in gross wages for 51.35 hours, respectively.  *Id.*  And in her last week of work, Miclat was paid $1,385.10 in gross wages for 36.45 hours of work.  *Id.* at ¶ 159.  The "demand that Miclat kick back her wages to satisfy PCS's future profits through February 2025, together with PCS's attorneys' fees and arbitration costs, plus interest, would bring Miclat below the FLSA minimum wage during her final workweek."  *Id.* at ¶ 160.

As with ACS, the Complaint alleges that "PCS and Klein have a policy and practice of entering into contracts with employees with identical or substantially

similar contract provisions to the 2021 contract with Miclat," and, "[o]n information and belief, PCS has followed through on those contracts by clawing back former employees' wages, obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA." *Id.* at ¶¶ 165–66.

## C.   Causes of Action and Prayer for Relief

Based on the foregoing allegations, DOL alleges that Defendants violated Section 6(a) of the FLSA, which requires every employer engaged in commerce to pay their employees minimum wage, 29 U.S.C. § 206(a), and Section 7(a) of the FLSA, which requires employers to pay employees at a rate of at least one and one-half times the regular rate at which he is employed if the employee works more than forty hours per week, 29 U.S.C. § 207(a). *Id.* at ¶¶ 167–72. The FLSA wage requirements will not be met "where the employee 'kicks-back' . . . to the employer . . . for the employer's benefit the whole or part of the wage delivered to the employee," and unless wages "are paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. DOL contends that by demanding employees pay Defendants damages that account for anticipated future profits, arbitration costs, and attorneys' fees upon their early departure from employment, Defendants are illegally requiring the employees to "kick-back" wages, which brings their wages below the FLSA minimum and overtime wage requirements. Am. Compl. at ¶¶ 168, 171.

DOL seeks a declaration that Defendants' contract violates the FLSA, injunctive relief permanently restraining Defendants from violating Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5) of FLSA, and award of damages. *Id.* at 22–23.

## II.    Related Proceedings

Vidal and Miclat have filed separate actions against Defendants based on many of the same facts underlying this case.  *See* Complaint, *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-5535, ECF No. 1 (E.D.N.Y. Sept. 16, 2022); Complaint, *Miclat v. Advanced Care Staffing, LLC et al*, No. 23-cv-5296, ECF No. 1 (E.D.N.Y. July 12, 2023).  The Court granted a preliminary injunction pausing the arbitration brought against Vidal by ACS.  *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-05535, 2023 WL 2783251, at *1 (E.D.N.Y. Apr. 4, 2023).  PCS then "voluntarily entered into a stay of Miclat's pending arbitration in light of the proceedings in *Vidal.*"  Mot. to Stay at 1, *Miclat v. Advanced Care Staffing, LLC et al*, 23-cv-5296, ECF No. 15 (E.D.N.Y. Aug. 9, 2023).  The Second Circuit has since affirmed this Court's entry of a preliminary injunction in Vidal's case, *see Vidal v. Advanced Care Staffing, LLC*, No. 23-303, 2024 WL 980634, at *2 (2d Cir. Mar. 7, 2024), and the arbitrations against Vidal and Miclat remain paused.

## III.    Motion to Dismiss

On September 28, 2023, Defendants filed a fully briefed motion to dismiss based on lack of subject matter jurisdiction and failure to state a claim.  *See* Mot. to Dismiss, ECF No. 28; Mem. of L. in Opp'n to Mot. to Dismiss ("Opp'n Br."), ECF No. 29; Reply Br., ECF No. 30.  Defendants argue that the Complaint should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1), and for failure to state a claim under Rule 12(b)(6).

## LEGAL STANDARD

"In considering a facial motion to dismiss [for lack of Article III standing] under Rule 12(b)(1), the Court must 'determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue.'" *Bloomberg Fin. L.P. v. UBS AG*, 358 F. Supp. 3d 261, 277 (S.D.N.Y. 2018) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016)). "The Court must accept as true all material factual allegations of the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* (cleaned up). Moreover, to demonstrate Article III standing, the party invoking federal jurisdiction must plausibly plead (1) an injury in fact; (2) a causal connection between the injury and conduct complained of; and (3) that it is likely that the injury will be redressed by a favorable decision. *Id.* "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss," the court presumes "'that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

To survive a 12(b)(6) motion to dismiss, a plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## DISCUSSION

Defendants bring three arguments as to why DOL's claims should be dismissed.  They argue that (1) DOL lacks standing to bring its claims because it does not allege a concrete and particularized harm, Opening Br. at 9–13; (2) DOL's Complaint fails to state a plausible claim because it does not allege that any employee actually received less than the minimum wage or overtime wage required by the FLSA, *id.* at 14–18; and (3) DOL's Complaint fails to state a plausible claim because potential breach of contract damages are not "kick-backs" of earned wages, *id.* at 18–26.  Because the Court finds each of these arguments unavailing, it denies Defendants' motion.

### I.  Standing

As mentioned above, to demonstrate Article III standing, a party must plausibly plead (1) an injury in fact; (2) a causal connection between the injury and conduct complained of; and (3) that it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61.  Defendants argue that DOL's Complaint must be dismissed for lack of subject matter jurisdiction because it cannot demonstrate that the employees whose interests it asserts in this litigation have suffered an injury in fact, the first of three required elements for establishing standing.

According to Defendants, neither Vidal nor Miclat has suffered any concrete injury because their arbitrations have not gone forward and, as a result, they have not been required to pay Defendants any sum of money.  Instead, Defendants point out that a number of uncertain events must occur before Vidal and Miclat suffer an

11

FLSA violation: (1) an arbitration would have to proceed; (2) Defendants would have to prevail at arbitration; (3) Defendants would have to prove damages; and (4) those damages would have to bring Vidal's and Miclat's wages under FLSA-required minimums.  Defendants argue that this chain of events is too speculative to satisfy Article III standing.

DOL contends that this argument fails for two reasons.  First, DOL argues that it has standing because it is enforcing federal law under Article II; and (2) even if the traditional standing requirements apply to DOL, its Complaint can satisfy them.  The Court addresses each argument in turn.

A.    <u>DOL Has Standing to Enforce the FLSA on Behalf of the Aggrieved Employees</u>

DOL first argues that Defendants' challenge to DOL's standing under the three-part Article III test that applies to private plaintiffs is the wrong framework. It argues instead that it has standing to bring suit because it is exercising its authority under Article II of the U.S. Constitution, which Congress recognized when enacting the FLSA.  DOL points to the text of the FLSA itself, which specifically confers upon DOL the authority to "bring an action in any court of competent jurisdiction to recover" unpaid minimum wages or overtime compensation and liquidated damages, 29 U.S.C. § 216(c), and the exclusive authority to seek injunctions restraining violations of the FLSA, 29 U.S.C. §§ 211(a), 217.

In support of this argument, DOL cites *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021), wherein the Supreme Court described the Article III injury requirement for private plaintiffs as distinct from the Executive Branch's Article II

12

authority.  The Court explained that requiring private plaintiffs to demonstrate an injury in fact prevents infringement "on the Executive Branch's Article II authority" to determine "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" because, unlike the Executive Branch, "[p]rivate plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 577).  Put differently, because the U.S. Constitution charges the Executive with "tak[ing] Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the Executive has "a judicially cognizable interest in the enforcement and defense of federal law," Tara Leigh Grove, *Standing Outside of Article III*, 162 U. Pa. L. Rev. 1311, 1322 (2014).  As such, "the executive may assert in court the federal government's sovereign interests without satisfying the injury, causation, or redressability requirements that the judiciary applies to other actors." *Id.*

Defendants dispute DOL's claim that the FLSA's text confers standing on DOL here.  Notably, however, Defendants have been unable to point to a single case—in their briefing or at oral argument — in which any court has held that, despite the FLSA's express delegation of authority to DOL to bring enforcement actions, DOL must nevertheless satisfy the traditional Article III standing requirements.  Nor have Defendants been able to locate any other case in which a party has even challenged DOL's standing to seek relief on behalf of aggrieved employees in an FLSA enforcement action, as Defendants do here.

In the absence of such authority, and in light of the Executive's "constitutional duty[] to 'take Care that the Laws be faithfully executed,'" *Lujan*, 504 U.S. at 577 (quoting U.S. Const. art. II, § 3), the Court declines Defendants' invitation to impose additional constraints on the authority Congress has expressly given DOL to bring suit to enforce the FLSA.

Defendants' challenge to DOL's standing thus fails.  In an abundance of caution, however, the Court proceeds to consider whether DOL satisfies the traditional Article III standing requirements—and specifically whether Defendants are correct in claiming that the employees described in the complaint have suffered no "injury" sufficient to confer standing.

B.    The Complaint Plausibly Alleges an Injury to Defendants' Employees Sufficient to Confer Standing

DOL argues that it has standing because, in the alternative, it satisfies the injury requirements "more generally applicable to private plaintiffs."  Opp'n Br. at 5. DOL contends that the employees on whose behalf it brings the lawsuit can establish "injury in fact."  *Spokeo, Inc. v Robins*, 578 U.S. 330, 339 (2016).  The Court agrees that DOL has standing under the traditional Article III framework.

To start, the Complaint alleges sufficient facts regarding the threat of future injury to Vidal and Miclat to satisfy standing for injunctive and declaratory relief. "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent[.]" *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury

14

is not too speculative for Article III purposes — that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Therefore, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). Moreover, where "plaintiffs seek declaratory and injunctive relief," they "must show [they are] suffering an ongoing injury or face[] an immediate threat of injury" to satisfy Article III standing. *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (citation omitted).[2]

While the arbitration proceedings against Vidal and Miclat have not yet occurred, the Complaint alleges a chain of events indicating that the injury DOL complains of is imminent. Specifically, DOL alleges that: Vidal and Miclat signed contracts entitling Defendants to recoup lost profits and other costs and fees if they terminated their employment without "Good Reason" prior to a three-year term of employment; Vidal and Miclat did terminate their employment agreements prior to the three-year contract term; ACS wrote Vidal a letter threatening to seek damages of at least $24,000 if he followed through with his resignation; Defendants initiated arbitrations against both Vidal and Miclat alleging that they terminated their employment without "Good Reason" and seeking lost profits, attorneys' fees, costs of

---

[2] Declaratory Judgment Act actions "are justiciable only in cases in which an 'actual controversy' exists," and "[t]he relevant inquiry for this prerequisite is coextensive with the analysis applicable to the 'case or controversy' standard embodied in Article III of the United States Constitution." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002). Therefore, the Court assesses DOL's standing to seek injunctive and declaratory relief in tandem.

arbitration, and interest; and, if Vidal and Miclat were required to pay those damages, their net wages would be brought below what the FLSA requires.  DOL also alleges that Defendants "have a policy and practice of entering into," Am. Compl. at ¶¶ 112, 165, such contracts with employees, and have previously followed through on these contracts by "clawing back" former employees' wages, *id.* at ¶¶ 113, 166.  Taken together, these allegations create a "substantial risk that the harm" at issue here — that Defendants' employees will not be paid their statutorily-required wages free and clear — "will occur."  *Susan B. Anthony List*, 573 U.S. at 158 (citation omitted).

Despite Defendants' assertions otherwise, the uncertainty associated with the outcome of the arbitration proceedings does not render Vidal's and Miclat's injuries impermissibly attenuated.  Indeed, courts have consistently found the injury in fact requirement satisfied where plaintiffs' injuries might hinge on future legal proceedings.  For example, courts have found that plaintiffs who are seeking a declaratory judgment relating to a proceeding that has not yet been filed have shown "a sufficient likelihood of future injury" based on that future proceeding.  *Gov't Emps. Ins. Co. v. Saco*, No. 12-cv-5633, 2014 WL 639419, at *8 (E.D.N.Y. Feb. 14, 2014); *see also Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 274 (1941).

Additionally, the Second Circuit has reached the same conclusion in an employment-related case.  In *Xin Wei Lin v. Chinese Staff & Workers' Association*, No. 11-cv-3944, 2012 WL 5457493, at *1 (S.D.N.Y. Nov. 8, 2012), plaintiffs brought claims against labor organizations based on "contracts in which [p]laintiffs promised to pay [the labor organizations] portions of any recovery that [p]laintiffs received from

16

lawsuits against their employers[.]"  On appeal, the Second Circuit determined that the plaintiffs had "alleged a sufficient likelihood of future injury stemming from" those contracts.  *Xin Wei Lin v. Chinese Staff & Workers' Ass'n*, 527 F. App'x 83, 87 (2d Cir. 2013) (unpublished).  The plaintiffs had not yet paid the labor organizations the amounts owed under some of those agreements, and the labor organizations had not brought suit to enforce the agreements.  Yet the Court found that the plaintiffs' allegations of the organizations' efforts to collect the payments rendered the likelihood of future injury "more than hypothetical or conjectural, and sufficiently concrete and imminent to create standing for declaratory and injunctive relief."  *Id.*

Similarly, in *Ketner v. Branch Banking & Trust Co.*, 143 F. Supp. 3d 370, 375 (M.D.N.C. 2015), plaintiffs disputed their former employer's requirement that they repay costs for a mandatory training associated with their employment if they resigned before completing a five-year term of employment.  The defendant moved to dismiss for lack of standing because the plaintiff had "not repaid any portion of his loan obligation."  *Id.* at 382.  Because the plaintiff alleged that the former employer had demanded payment, threatened legal action, and enforced the repayment agreement against other former employees, the court concluded that the plaintiff's injury was "neither speculative or hypothetical" but based on "an objective and reasonable apprehension of future litigation."  *Id.* at 383 (citation omitted).

So too, here.  Defendants have taken concrete steps to recoup the costs owed to them pursuant to the employment agreements signed by Vidal and Miclat.  Beyond merely threatening litigation as the defendants did in *Xin Wei Lin* and *Ketner*,

Defendants initiated arbitrations against both Vidal and Miclat.[3]   While those arbitrations are presently stayed due to a court order in parallel litigation, Defendants have made no indication that they will not seek to proceed with the arbitrations absent such judicial intervention.   Accordingly, the likelihood of future injury in this case is "sufficiently concrete and imminent to create standing for declaratory and injunctive relief."  *Xin Wei Lin*, 527 F. App'x at 87.

It is true that the specific harms DOL alleges have been suffered by Vidal and Miclat to date can only be redressed by injunctive or declaratory relief.   At present, because Vidal and Miclat (unlike the other unnamed employees in the complaint) have not paid Defendants the breach of contract damages that Defendants are seeking through arbitration, "an award of money damages will not redress" their injuries, and "they lack standing for such claims."  *Id.* at 87.   But "[t]he FLSA grants the Secretary of Labor the right 'to bring an action by or on behalf of any employee' to recover unpaid minimum wages or overtime compensation."  *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 394 (E.D.N.Y. 2013) (quoting 29 U.S.C. § 216(c)).   And here, DOL also brings this lawsuit on behalf of certain unnamed former employees who were subject to similar treatment as Vidal and Miclat, and whose wages

---

[3] Defendants' assertion that any injury to Vidal and Miclat is too speculative because damages would have to be determined by an arbitrator, Opening Br. at 21; Reply Br. at 16 n.3, is a red herring.   While the defendants in *Xin Wei Lin* and *Ketner* sought concrete amounts of money from the plaintiffs, an adjudicator in those cases would still have had to determine that the defendants' demands could be enforced before the employees were required to make any payments.   That an arbitrator, rather than another adjudicator, would determine liability and the precise amount of damages in this case is a distinction without a difference.

Defendants allegedly "followed through with clawing back . . ., obtaining the return of those wages and bringing employees' compensation below the levels required by the FLSA." Am. Compl. at ¶¶ 5, 7.[4] The harm that DOL alleges as to those employees — namely, that their compensation has been reduced to below the levels protected by the FLSA because Defendants have already succeeded in unlawfully "clawing back" their wages — is "concrete, particularized, and actual." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020). Accordingly, DOL has standing to pursue the monetary damages allegedly owed to these employees under the FLSA.

## II. Failure to Allege FLSA Violations

Defendants also seek to dismiss DOL's Complaint for failure to state a claim. DOL brings two causes of action under the FLSA. First, it claims that Defendants violate Sections 6(a) and 15(a)(2) of the FLSA, which require employers to pay employees certain minimum wages. *See* 29 U.S.C. § 206(a). Second, it claims that

---

[4] To the extent Defendants contend that the Court must ignore DOL's allegations as to the unnamed employees because they are not sufficiently specific, this Court disagrees. While the Second Circuit has set forth certain requirements for pleading FLSA claims, it has also held that "[w]hat aspects of Plaintiffs' position, pay, or dates of employment are necessary to state a *plausible* claim for relief consistent with [those requirements] is a case-specific inquiry for the trial court." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) (emphasis in original). Here, the Court concludes that the specific allegations as to Vidal and Miclat, together with DOL's allegations that Defendants engaged in a broad practice of entering into similar contracts with other employees, render the allegations as to the unnamed employees plausible at this juncture. *Acosta v. A.C.E. Rest. Grp., Inc.*, No. 15-cv-7149, 2017 WL 2539387, at *2 (D.N.J. June 12, 2017) (concluding that the Secretary of Labor's complaint "satisfie[d]" the FLSA overtime "pleading standard by alleging *examples of* dates and times when employees worked in excess of forty hours in a work week without the benefit of overtime compensation." (emphasis supplied)); *Su v. Ernie's Auto Detailing Inc.*, No. 20-cv-17785, 2023 WL 8643794, at *3 (D.N.J. Dec. 14, 2023) (similar).

Defendants violate Sections 7(a) and 15(a)(2) of the FLSA, which require employers to pay employees certain overtime wages if the employees work over forty hours in a week. *See* 29 U.S.C. § 207(a). "To state an FLSA minimum wage claim, it is sufficient for a plaintiff to allege facts about her salary and working hours, such that a simple arithmetical calculation can be used to determine the amount owed per pay period." *Lopez-Serrano v. Rockmore*, 132 F. Supp. 3d 390, 402 (E.D.N.Y. 2015) (cleaned up). And "to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013).

Defendants argue that, for similar reasons that DOL lacks standing, it fails to state a claim for violations of these FLSA provisions. That is, "[b]ecause DOL does not allege that Defendants paid their employees less than minimum wage or the overtime wages to which they are entitled, its Amended Complaint should be dismissed." Opening Br. at 14.

In their motion to dismiss, Defendants contend that DOL's claims fail because it has only made allegations regarding Vidal's and Miclat's earnings—it has not alleged that those earnings have "been reduced below the FLSA floor." Opp'n Br. at 18. However, the string of cases Defendants cite in support of that proposition are distinguishable. In those cases, the plaintiffs alleged that their employers had *already* failed to pay them what the FLSA requires but failed to show that the actual wages they received were less than what the FLSA requires. Those plaintiffs failed,

for example, to demonstrate that they were, in fact, paid below FLSA minimums, *Marcial v. New York Hudson Fam. Rest. Inc.*, No. 18-cv-0663, 2019 WL 1900336, at *6 (S.D.N.Y. Apr. 29, 2019), or to allege their earnings with specificity, *e.g.*, *Walsh v. Lalaja*, 565 F. Supp. 2d 766, 772 (E.D.N.C. 2021).

Here, by contrast, DOL is not alleging that Defendants set an hourly pay rate or otherwise failed to pay Vidal and Miclat what the FLSA requires in the first instance. Rather, DOL alleges that Defendants are pursuing damages in arbitrations that, if obtained, would bring Vidal's and Miclat's take-home wages below FLSA minimums. Unlike the plaintiffs in Defendants' cited cases, DOL pleads specific facts about the hours Vidal and Miclat worked during particular weeks, what they were paid for those weeks, the amounts of money Defendants are seeking to recoup from them through arbitration, and the effect that would have on their wages.[5]

---

[5] Specifically, DOL alleges that Vidal was paid $20,372.90 in gross wages for his entire period of employment (for a total of 512.51 hours), $1,480.50 in gross wages for 40.75 hours of work the week ending April 9, 2022, and $839.04 in gross wages for 22.08 hours of work in his last week of work. Compl. ¶¶ 105–10. DOL further alleges that ACS has demanded $24,000 in future profits, *id.* ¶ 99, and has already incurred a $1,900 filing fee and $750 case management fee in connection with the arbitration against him, *id.* ¶ 103. DOL thus alleges that Defendants' demand for future profits, attorneys' fees, arbitration costs, and interest "would bring Vidal below the FLSA minimum wage during his final workweek," and below the FLSA minimum wage and required overtime rate (in overtime workweeks) for his entire period of employment with ACS. *Id.* ¶¶ 106–07.

Additionally, the Complaint alleges that Miclat was paid $2,987.18 in gross wages for 65.74 hours the week ending June 25, 2022, $2,994.59 in gross wages for 65.87 hours the week ending July 23, 2022, $2,166.95 in gross wages for 51.35 hours the week ending November 12, 2022, and $1,385.10 in gross wages for 36.45 hours of work in her last week of work. Compl. ¶¶ 159–63. The Complaint further alleges that PCS has already incurred a $2,200 filing fee in connection with the arbitration

Therefore, while Defendants are correct that plaintiffs must plead FLSA claims with specificity, DOL has plainly done so with its allegations as to Vidal and Miclat.  It is true that the Complaint does not allege that Defendants already clawed back Vidal's and Miclat's wages below what the FLSA requires.  But the cases Defendants cite do not hold that a past FLSA violation is a prerequisite to bringing an enforcement action under the statute.  While this Court is unaware of any case law within this circuit on the issue, DOL points to persuasive out of circuit cases that allowed actions to prevent employers from collecting FLSA "kick-backs" to proceed, despite the fact that the plaintiffs had not yet paid the alleged "kick-backs" to their employers.  *See Stein v. HHGREGG, Inc.*, 873 F.3d 523, 534–35 (6th Cir. 2017); *Ketner*, 143 F. Supp. 3d at 382–84.

Absent a requirement that a plausible FLSA claim allege a prior violation of the statute's wage mandates, the Court understands Defendants' 12(b)(6) argument as a restatement of their previous contention that DOL lacks standing.  This Court already rejected Defendants' Article III argument.  Dressed up as a motion to dismiss

---

against her. *Id.* ¶ 157.  DOL thus alleges that Defendants' demand for future profits, attorneys' fees, arbitration costs, and interest, would bring her "below the FLSA minimum wage during her final workweek." *Id.* ¶ 160.

Finally, Defendants suggested at oral argument that they are no longer seeking to shift the costs at arbitration to their employees.  Tr. of Mar. 21, 2024 Proceedings at 14:23–25, ECF No. 36.  To the extent Defendants argue that, despite their contractual prerogative to do so, they are no longer seeking to shift arbitration costs to their employees, the Court does not consider that assertion at this juncture because "[i]n considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999).

for failure to state a claim for relief under the FLSA, that argument fares no better. Accordingly, for the reasons stated in Section III.A.2, *supra*, DOL has sufficiently alleged that Defendants' conduct violates the FLSA.

### III.    Failure to Allege Contract Damages are "Kick-backs"

Finally, Defendants argue that DOL's Complaint fails to state a claim because the theory of its case fails as a matter of law.  The parties' dispute centers on an FLSA implementing regulation, which states that:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35.

DOL argues that, by seeking to recoup lost profits, arbitration costs, and attorneys' fees from their former employees, Defendants are unlawfully kicking back the employees' wages and violating their duty under the FLSA to pay employees free and clear.  Defendants contend that this argument fails because contract damages cannot constitute "kick-backs" in this context.

While there are few reported cases addressing whether damages sought for breach of contract may be considered illegal "kick-backs" under FLSA, the parties

jointly rely on a small body of cases addressing whether employers' training cost repayment policies violate the FLSA that helps guide this Court's reasoning.  The first of those cases is *Gordon v. City of Oakland*, 627 F.3d 1092, 1093 (9th Cir. 2010), wherein the Ninth Circuit considered a "policy requiring police officers to repay a portion of their training costs if they voluntarily leave the City's employment before completing five years of service."[6]  The plaintiff, who was required to repay the City $6,500 at the time of her resignation, argued that the policy violated the FLSA because, "subtracting the costs she paid to the City for the training program, she was actually paid a negative sum for her last week of work."  *Id.* at 1095.  The Ninth Circuit rejected the plaintiff's argument because the payment she "made to the City is repayment of a voluntarily accepted loan, not a kick-back."  *Id.* at 1096.

Relying on *Gordon*, courts have rejected FLSA "kick-back" claims where employees challenged policies requiring them to repay their employers for fees upon their termination where the fee "corresponds to the maximum value of the training" the employer provided the employee, *Park v. FDM Group (Holdings) PLC*, No. 16-cv-1520, 2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017), *vacated in part on other grounds*, *Park v. FDM Grp., Inc.*, No. 16-cv-1520, 2018 WL 4100524 (S.D.N.Y. Aug. 18, 2018), or was "incurred for [the] employee's benefit," *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962, 977 (N.D. Ill. 2019).  But at least one court has found

---

[6] *Gordon* and its progeny rely on a Seventh Circuit decision, *Heder v. City of Two Rivers*, 295 F.3d 777 (7th Cir. 2002), which upheld a requirement that former employees repay training costs.  However, because *Heder* considered whether the agreement in question "was valid and enforceable *under Wisconsin law*," the Court does not rely on that case here.  *Ketner*, 143 F. Supp. 3d at 383 (emphasis supplied).

that where the training program did not confer to the employee "any benefit that is recognized within the broader marketplace or to him as an associate," the requirement that the employee repay the costs of the training program could constitute a "kick-back" that violates the FLSA. *Ketner*, 143 F. Supp. 3d at 384.

Taken together, these cases articulate a coherent framework for assessing FLSA "kick-back" claims. That is, a policy requiring employees to repay costs that the employer incurred for the employees' benefit — such as "training costs for portable licenses and certifications," *McClain v. Cape Air*, No. 22-cv-10649, 2023 WL 3587284, at *6 (D. Mass. May 22, 2023) — does not constitute a "kick-back" under the FLSA. But if the incurred costs primarily benefit the employer, they cannot lawfully be shifted to the employees. That framework accords with the FLSA statute and regulations, which state that "'kick-back[s]' . . . *for the employer's benefit*" violate the statute's wage requirements, 29 C.F.R. § 531.35 (emphasis supplied), and while "the reasonable cost" of furnishing an employee "with board, lodging, or other facilities," can be included in the calculation of an employee's wage, 29 U.S.C. § 203(m)(1), "the cost of furnishing 'facilities' which are *primarily for the benefit or convenience of the employer* will not be recognized as reasonable," 29 C.F.R. § 531.32(c) (emphasis supplied)

In *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2023 WL 5104066, at *15 (S.D. Ohio Aug. 9, 2023), the District Court for the Southern District of Ohio applied that framework to deny a motion to dismiss an FLSA claim that closely resembles the instant case. There, as here, plaintiffs brought a case against a recruiting and

staffing company "that enlists foreign nurses, primarily from the Philippines, to work in healthcare facilities across the United States." *Id.* at \*2.  The defendant staffing company sponsored nurses' applications for permanent residence and, if the nurses terminated their employment before three years, required the nurses to pay liquidated damages. *Id.*  In assessing the plaintiff's claim that the liquidates damages provision constituted a "kick-back" under the FLSA, the court framed the issue as "whether any portion of the $20,000 liquidated damages" that the plaintiff paid the defendant "was intended to recoup expenses incurred for [the defendant's] benefit." *Id.* at \*14.  Because the plaintiff "plausibly alleged that $8,000 of her liquidated damages covered [the defendant's] own operating expenses," and "an $8,000 kickback would reduce [the plaintiff's] net pay below zero," the Court held that the plaintiff "ha[d] nudged th[e FLSA] claim into the realm of plausibility." *Id.* at \*15.

Applying that same test here, the Court concludes that DOL plausibly alleges that at least some of the damages Defendants seek to collect through arbitration are for Defendants' benefit and thus constitute an unlawful "kick-back."  Most notably, in their contracts, Defendants reserve the right to recover "*loss of profits* (reflecting not only loss of anticipated profits under this Agreement but also resulting from the impact of Employer's relationships with its clients)" if the employees do not fulfill their three-year contract.  ACS Contract at 6 (emphasis supplied).  The contracts also require employees to reimburse Defendants "for all reasonable costs, including all attorneys' fees that Employer incurs in enforcing its rights and remedies." *Id.* at 7.  In line with those provisions, Defendants specifically sought "lost profits,"

26

"reasonably attorneys' fees," and arbitration costs in their arbitration demand letters against Vidal and Miclat. Vidal Arbitration Demand at 7, Miclat Arbitration Demand at 8. The Court agrees with DOL that these sought-after damages "are categorically for Defendants' benefit." Opp'n Br. at 19.

Nevertheless, Defendants appear to contend that their requested damages cannot constitute "kick-backs" because they do not seek a specified amount of money from their employees; rather, they have demanded that these employees appear at arbitration, where they seek "all available damages." *See* Reply Br. at 7. Quite the opposite. That Defendants specifically seek to recover categories of damages that inherently benefit them only bolsters DOL's "kick-back" claim. Unlike in *Carmen*, where the court had to inquire into how the liquidated damages would be used, the contracts here demarcated which damages would recover costs Defendants incurred for their employees' benefit (such as certain credentialing costs, which DOL does not challenge), and which costs they incurred for their own benefit (such as the lost profits at issue here).

Of course, Defendants "may eventually show, with additional facts, that" the damages they seek were incurred primarily for their employees' benefit. *Carmen*, 2023 WL 5104066, at *15. But at this juncture, DOL's allegations that Defendants initiated arbitrations to pursue "loss of anticipated profits," arbitration costs and fees, and attorney's fees are enough to survive Defendants' motion to dismiss. Whether the damages Defendants seek do, in fact, constitute "kick-backs" "is best resolved with the benefit of discovery." *McClain*, 2023 WL 3587284, at *7.

27

Finally, the Court is not persuaded by the parade of horribles that Defendants predict will result from a decision allowing DOL's lawsuit to proceed to discovery. Contrary to Defendants' foreboding characterization, by concluding that the damages Defendants seek *could* amount to "kick-backs" under the FLSA, the Court is not holding that "any employment agreement with an arbitration provision would violate the FLSA . . . if the employee might have to pay contractual damages to the non-breaching employer." Opening Br. at 28.

In *Mayhue's Super Liquor Stores, Inc. v. Hodgson*, 464 F.2d 1196, 1198 (5th Cir. 1972), the Fifth Circuit explained that while an employer could not, under the FLSA, require employees to repay cash register shortages they did not cause, an employer could require employees to repay cash register shortages that could be specifically attributed to the employees' theft. In determining that the FLSA could preclude the sought-after damages here, the Court's decision is not in tension with *Mayhue's* holding; as there, employers remain free to recoup costs that "obviously would not collide with the Act." *Id.* Put differently, the Court does not hold that employers can never seek contract damages based on their employees' wrongdoing; nor does it hold that such claims can never be subject to arbitration. Rather, it simply concludes that on these facts, DOL has plausibly alleged that the damages Defendants seek to collect from the employees described in the Complaint violate the FLSA.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint

is denied.

     SO ORDERED.


                                    */s/ NRM*
                               NINA R. MORRISON
                               United States District Judge

Dated: May 8, 2024
       Brooklyn, New York